The STATE of Texas, Appellant,

v.

JAPAGE PARTNERSHIP, A Texas General Partnership, Appellee.

No. 01–00–00942–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 9, 2002.

Rehearing Overruled July 24, 2002.

Hazen E. Woods, Asst. Atty. Gen., Transportation Division, Austin, for appellant.

Peter A. Smart, Crain, Canton & James, P.C., Houston, for appellee.

Panel consists of Justices MIRABAL, HEDGES, and JENNINGS.

## OPINION

TERRY JENNINGS, Justice.

The State brings this appeal from a judgment in a condemnation proceeding. The trial court granted a partial summary judgment in favor of the appellee, Japage Partnership, on the merits and denied the State's motion for partial summary judgment. Both motions addressed the issue of Japage's ownership interest in the appurtenant parking and access rights in its condemned property. The case was then submitted to a jury on the issue of the value of the property.

In two issues, the State argues the trial court erred in granting Japage's second motion for partial summary judgment and

in denying the State's motion for partial summary judgment. We affirm.

## Factual and Procedural Background

On behalf of the Texas Department of Transportation, the State filed a petition to condemn and acquire fee simple title to the surface rights of several acres of real property, located adjacent to Willowbrook Mall, so as to widen a section of Highway 249.

Japage was the title owner of a 20,301 square foot section of the condemned property, which consisted of a building pad site of a restaurant operated by TGI Friday's, Inc. Japage purchased the property in 1992 from the Resolution Trust Corporation (RTC) for $950,000. The special commissioners appointed by the trial court in the condemnation proceeding found the value of this section of the condemned property to be $2,448,213.75, and the State deposited that amount into the registry of the court, pending a determination of the extent and value of Japage's ownership interest in the property.

The State's petition for condemnation named Japage and other entities as parties with potential ownership interests in the property,[1] including the property's lessee, TGI Friday's.[2] Japage answered and appeared, and asserted that, in addition to its ownership interest in the building pad site, it had subsequently acquired appurtenant rights of parking and access in and through the surrounding property.

---

1. The other entities named were Musa Dakri (trustee and easement holder), Duree B. Jorgensen a/k/a Duree B. Trautwein (easement holder), 1994 Land Fund II—Dallas 1, L.P. (easement holder), Willowbrook Ventures, Inc. (easement holder), Galwan Texas, Inc. (easement holder), Sturgis Realty, Ltd. (easement holder), Pacifica West Financial Corporation (easement holder), Texas Capital Bank, N.A. (lienholder), and Coastal Banc SSB, as successor in interest to Texas Capital Bank, N.A. (lienholder). With the exception of

Coastal Banc, which filed a disclaimer of interest, none of these parties appeared. Harris County and its related taxing entities also intervened and recovered ad valorem property taxes in the amount of $20,020.69.

2. The State ultimately settled with TGI Friday's for $1,662,575.34, including prejudgment interest, as the fair market value of its condemned leasehold.

The State asserted in its motion for partial summary judgment that no issue of material fact existed regarding Japage's lack of any ownership interest in appurtenant easement and access rights to the property. In its second motion for partial summary judgment, Japage asserted that no issue of material fact existed regarding its clear ownership of appurtenant parking and access rights to the property.[3] The trial court denied the State's motion and granted Japage's motion, holding that Japage "owned rights appurtenant to its property, as more particularly described in the June 14, 1985 Reciprocal Easement and Operating Agreement."

The case was submitted to a jury on the issues of (1) the fair market value of Japage's condemned property and (2) the amount of damages, if any, to the remainder of Japage's property as a result of the condemnation. The jury found the fair market value of the property, as of November 30, 1994, to be $1,900,000. As to the remainder of Japage's property, it found no damage resulting from the condemnation.

Before the entry of judgment, Japage, based on the evidence presented, moved for a judgment notwithstanding the verdict, requesting the trial court to disregard the jury's finding of no damages as to the remainder of its property. Remarkably, experts for the State testified the value of the damage to the remainder varied between $163,120 and $978,527. Japage's expert testified the value of the damage to the remainder was only $94,350. The trial court granted Japage's motion, rendered judgment that the jury finding regarding the value of the damages to the remainder was not supported by the evidence, and awarded Japage an additional $94,350 as compensation for the damages to the remainder of its property. The trial court also rendered judgment for Japage for $1,900,000, based on the jury's determination of the fair market value of the condemned property, as well as interest and taxable court costs.

The State filed a motion for new trial, which was overruled by operation of law.

## Partial Summary Judgments

A party moving for summary judgment has the burden of proving there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt.*, 690 S.W.2d 546, 548 (Tex. 1985); *Farah v. Mafrige & Kormanik*, 927 S.W.2d 663, 670 (Tex.App.-Houston [1st Dist.] 1996, no writ). When deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true. *Nixon*, 690 S.W.2d. at 548–49. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon*, 690 S.W.2d at 548–49. When a defendant moves for summary judgment, it must either: (1) disprove at least one element of the plaintiff's cause of action; or (2) plead and conclusively establish each essential element of its affirmative defense, thereby rebutting the plaintiff's cause of action. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Farah*, 927 S.W.2d at 670.

When, as here, both parties move for summary judgment, the appealing party may challenge the denial of its own motion as well as the judgment in favor of the prevailing party. *CU Lloyd's v. Feldman*, 977 S.W.2d 568, 569 (Tex.1998). Each party must carry its own burden, however, both as movant and in response to the other party's motion, as nonmovant. *Id.; James v. Hitchcock Indep. Sch. Dist.*, 742

---

**3.** The trial court denied Japage's first motion for partial summary judgment on this issue.

S.W.2d 701, 703 (Tex.App.-Houston [1st Dist.] 1987, writ denied).

### State's Motion for Partial Summary Judgment

In its second issue, the State contends the trial court erred in denying its motion for partial summary judgment. In its motion, the State relied solely on two pieces of summary judgment evidence: (1) excerpts from the October 21, 1997 deposition testimony of George M. Lee, the managing partner of Japage, and (2) a June 14, 1985 Reciprocal Easement and Operating Agreement ("REOA") between James L. Maxwell and Albert Peyton Cottrell, individually, and Willowbrook Phase II, a Texas general partnership.[4]

#### *Inclusion of Property in REOA*

■ The State argued in its motion that, as a matter of law, Japage held no ownership interest in any appurtenant rights to the property in question because the tract at issue was specifically excluded from the REOA's descriptions of the property affected by that agreement. On appeal, at oral argument, the State conceded this point and now does not dispute that the descriptions of property affected by the REOA include the property at issue. Based on our review of the REOA, we agree.

The REOA was executed by and between Maxwell and Cottrell, individually[5] and as general partners of Willowbrook Phase II. That agreement reads, in part, as follows:

WHEREAS, Maxwell/Cottrell and Willowbrook mutually desire to expressly set forth herein certain agreements made between themselves concerning, among other matters, their mutual granting of *certain reciprocal private cross-access and parking easements,* ... and ... desire to establish, create, dedicate and grant *certain mutual, reciprocal and non-exclusive private easements for pedestrian and vehicular access, ingress and egress* over and across certain portions of Parcels "A" and "B" for the enjoyment, use and benefit of the Owner[6] ... hereby expressly agree that Parcel "A" and Parcel "B" shall be hereafter developed, held, sold, and conveyed subject to the following easements, restrictions, rights-of-way, covenants, and conditions, ... which shall run with Parcel "A" and Parcel "B", and *shall be binding on all parties hereafter having any right, title, or interest in or to the Property, or any part thereof,* as well as their respective heirs, executors, administrators, successors, and assigns, and which easements, restrictions, covenants, and conditions shall inure to the benefit of each Owner thereof....

(Emphasis added.)

■ If a written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). By its provisions, the REOA granted all current and future owners of parcels "A" and "B" reciprocal and non-exclusive easements appurtenant to the property, including access "over, through, and across" and use of the parking areas and roadways on both parcels. These easements were cre-

---

**4.** Maxwell and Cottrell were the general partners of Willowbrook Phase II.

**5.** At the time the REOA was executed, Maxwell and Cottrell individually owned the 20,-301 square foot parcel, although they executed a January 10, 1985 lease agreement with TGI Fridays under the name "Maxwell Cottrell Development."

**6.** "Owner" is defined in the REOA as "the record title holder or holders of the real property and improvements comprising either Parcel 'A' or Parcel 'B'."

ated "for the use and benefit" of the respective owners and their "tenants, customers, concessionaires, agents, invitees, officers, employees, and licensees."

Further, the effect of the REOA was to bind future owners of the described properties to the terms of the agreement. Section 9.04 of the REOA, entitled "Binding Effect," reads, in part, as follows:

The covenants, servitudes, premises and agreements contained herein are to run with the land and shall be binding on, benefit and inure to each Owner and its respective heirs, personal representatives, legal representatives, successors and assigns. Any conveyance, transfer, sale, assignment, lease or sublease ... made by any Owner or any interest in their respective property or improvement will and hereby is deemed to incorporate by reference the provisions of this Agreement, and the obligations of this Agreement from and after the date of transfer shall be binding on such transfers.

The property described in the REOA as "Parcel 'A'" and "Parcel 'B'" is specifically described in the body of the agreement and in several exhibits attached to the agreement. The property referred to as "Parcel 'A'" is comprised of six distinct tracts of property. One of these tracts is described as 1.1985 acres, and its description specifically *excludes* the 20,301 square foot parcel at issue. However, as argued by Japage, and as now conceded by the State, the description of another tract within "Parcel 'A'," comprising 15.485 acres, specifically *includes* the 20,301 square foot parcel within it. Therefore, by its terms, the REOA applied to the property, and the State's argument that the REOA excluded this property fails.

### Legal Effect of Easements in REOA

■ In addition, the State contends the language in the REOA purporting to cre-

ate reciprocal easements between the properties described in that agreement was without legal effect because there was no separation of ownership of those properties. The State relies on the fact that Maxwell and Cottrell jointly owned all the property described in the REOA. We note, initially, that the State presents this argument for the first time on appeal and did not present this argument to the trial court either in its motion for partial summary judgment or in its response to Japage's second motion for partial summary judgment. However, we will address it on the merits.

In support of its assertion that no easement between parcels of property can arise under a unity of ownership, the State relies on *Howell v. Estes*, 71 Tex. 690, 12 S.W. 62, 63 (1888). *Howell* involved two houses, each two stories high, which shared a common partition wall and were located on adjoining lots. *Id.* The upper rooms of both houses were reached by a common stairway located in one of the buildings. *Id.* The houses were originally owned by Howell's father, who, in his will, devised one of the buildings to Howell and the other to his daughter. *Id.* The successor-in-interest to the daughter subsequently refused Howell access to the stairway. *Id.* The Texas Supreme Court, presented with the question of whether the use of the stairway passed to Howell, observed as follows:

The principle is elementary that, to constitute an easement, the dominant and servient estates must be held by different owners; and when the owner of an estate enjoys an easement over another, and acquires title to the latter, the easement is thereby extinguished.

12 S.W. at 62. However, after noting the general rule, the court held the use of the stairway passed to Howell, reasoning, in part, as follows:

We think the weight of authority sustains the proposition that if an improvement constructed over, under, or upon one parcel of land for the convenient use and enjoyment of another contiguous parcel by the owner of both be open and usable and permanent in its character ... and the owner alienates the latter, *the use of such improvement will pass as an easement* ....

*Id.* (emphasis added). Therefore, *Howell* supports the proposition that an "easement" between two parcels of property may be created under a unity of ownership, but will not take legal effect until either of the parcels is sold to a separate owner. Thus, the reciprocal easements created by the REOA between the parcels described in that agreement took legal effect when either of the parcels was sold by Maxwell and Cottrell.

More recent cases support this conclusion. In *Preston Del Norte Villas Ass'n v. Pepper Mill Apartments, Ltd.*, 579 S.W.2d 267, 270 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.), the court held that an easement incorporated in a property declaration filed before the property was separated into two tracts was nonetheless reserved by the original owner. The court reasoned, in part, as follows:

> [D]efendants argue that for an easement to exist there must be dominant and servient estates held by different owners, and here there was no separation of ownership, since Preston Centennial owned the entire twenty-one acres at the time of the declaration. We do not agree. Even though there may have been no separation of ownership at the time of the declaration, Preston Centennial subsequently conveyed title to the condominiums to defendants, together with title to undivided interests in the common areas, subject to the provisions of the declaration. Consequently, *when*

> *defendants took title to their properties, a separation of ownership occurred, and defendants' titles became subject to the reserved easement.*

*Preston Del Norte*, 579 S.W.2d at 270 (emphasis added).

We conclude the reciprocal easements created between the parcels described in the REOA, while not effective as between Maxwell and Cottrell's unity of ownership, took legal effect immediately upon the partition of the property and, thus, Japage could have reasonably relied upon the existence of such easements when it purchased the property at issue.

### Testimony of George Lee

In its motion for partial summary judgment, the State also asserted that Lee, in his deposition testimony, denied the existence of any "writing which would create or relate to any asserted claim to any rights outside the subject 20,301 square foot tract." We disagree.

It is clear from the record that Lee did not deny the existence of any documents creating appurtenant rights in the 20,301 square foot tract. Rather, in response to questioning regarding Japage's production of documents responsive to a subpoena duces tecum, Lee merely denied he had any such documents in his possession. Even assuming Lee had been qualified as an expert witness on such matters, which he was not, his statements do not amount to a legal conclusion regarding the effect of documents not in his possession. TEX.R. EVID. 701. Thus, the State's argument on this issue also fails.

Because the arguments and summary judgment evidence presented to the trial court by the State do not establish, as a matter of law, that Japage holds no ownership interest in the property at issue, we hold the trial court did not commit error in

denying the State's motion for partial summary judgment.

We overrule the State's second issue.

**Japage's Second Motion for Partial Summary Judgment**

 In its first issue, the State contends the trial court erred in granting the second motion for partial summary judgment filed by Japage. In its motion, Japage asserted, as a matter of law, that, in addition to owning the 20,301 square foot parcel at issue, Japage also owned rights of access and parking appurtenant to the property.

As set forth above, the REOA established reciprocal rights of access and parking in the parcel at issue and other surrounding tracts. In 1986, Maxwell and Cottrell pledged certain property, including the parcel at issue, to Hardin Savings and Loan Association to secure a loan. The RTC subsequently acquired the property. In 1992, Japage purchased the 20,-301 square foot parcel from the RTC.

The sale of the property from the RTC to Japage was memorialized in a "Special Warranty Deed with Vendor's Lien," which reads, in part, as follows:

> Grantor hereby GRANTS, SELLS, CONVEYS, ASSIGNS and DELIVERS to the Grantee, without covenant or warranty express or implied ... all right, title and interest, if any, of the Grantor, as owner of the Property ... in and to ... (iv) *any easements, rights of way, rights of ingress and egress or other interests in, on, or to, any land ... abutting, adjoining or otherwise appurtenant to the Property, as well as all other rights, privileges and appurtenances* owned by the Grantor hereunder conveyed....

(Emphasis added.) The warranty deed also included an attached list of "Permitted Encumbrances" affecting the property. That list specifically enumerated the lease

held by TGI Friday's and the "[t]erms, conditions, and stipulations" contained in the REOA. Thus, when Japage purchased the property from the RTC, it succeeded to RTC's ownership interest in all appurtenant rights in the property, including those spelled out in the REOA. Based on the summary judgment evidence presented to the trial court, we hold Japage established, as a matter of law, its ownership interest in the appurtenant rights of parking and access to its property.

We overrule the State's first issue on appeal.

### Conclusion

We affirm the judgment of the trial court.