# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 26, 2007　　　　　Decided July 20, 2007

No. 06-1094

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION,
PETITIONER

v.

NATIONAL CEMENT COMPANY OF CALIFORNIA, INC. AND
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION,
RESPONDENTS

TEJON RANCHCORP,
INTERVENOR FOR RESPONDENT

———

On Petition for Review of an Order of the
Federal Mine Safety and Health Review Commission

———

*Robin A. Rosenbluth*, Attorney, Mine Safety & Health
Administration, argued the cause for the petitioner. *W.
Christian Schumann*, Counsel, was with him on brief.

*Margaret S. Lopez* argued the cause for the respondent.
*Michael T. Heenan* was with her on brief. *John T. Sullivan* and
*Thomas A. Stock*, Attorneys, entered appearances.

*Thomas C. Means* was on brief for intervenor Tejon
Ranchcorp in support of the respondent.

Before: SENTELLE, HENDERSON and ROGERS, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Secretary of Labor (Secretary) petitions for review of a decision of the Federal Mine Safety and Health Review Commission (FMSHRC or Commission) which reversed the decision of the administrative law judge (ALJ). The ALJ upheld the jurisdiction of the Mine Safety and Health Administration (MSHA) to issue a citation to the National Cement Co. of California, Inc. (National Cement) for failing to install guardrails or berms along a road National Cement uses to access its cement processing plant (Access Road) pursuant to a non-exclusive right-of-way grant from National Cement's lessor, Tejon Ranchcorp (Tejon). Section 4 of the Mine Safety and Health Act (Mine Act or Act) provides that "[e]ach coal or other mine . . . shall be subject to the provisions of this chapter." 30 U.S.C. § 803. Section 3(h)(1) of the Act defines the term "coal or other mine" to include "(A) an area of land from which minerals are extracted in nonliquid form or, if in liquid form, are extracted with workers underground[ or] (B) private ways and roads appurtenant to such area." 30 U.S.C. § 802(h)(1). The ALJ concluded that the Access Road is a "mine" under section 3(h)(1)(B)—so as to come within the jurisdiction of MSHA—because, under the unambiguous language of section 3(h)(1)(A) and the undisputed facts, it is both "private" and "appurtenant to" National Cement's Lebec Cement Plant, which is undisputedly a "mine" under section 3(h)(1)(A). *Nat'l Cement Co. v. Sec'y of Labor*, 27 F.M.S.H.R.C. 84 (2005) (ALJ Dec.). The FMSHRC reversed the ALJ, concluding that, although the road met the two unambiguous statutory criteria, the Congress did not intend such a road to be classified as a mine subject to Mine Act jurisdiction because this classification

will yield "absurd results." *Sec'y of Labor v. Nat'l Cement*, 27 F.M.S.H.R.C. 721 (2005) (FMSHRC Dec.); *see In re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643 (1978) ("This Court, in interpreting the words of a statute, has 'some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . .' " (quoting *Comm'r v. Brown*, 380 U.S. 563, 571 (1965)) (internal quotation omitted)). Because we conclude that the language of section 3(h)(1)(B) is ambiguous, we vacate the Commission's decision and remand for the Secretary to interpret the statute's ambiguous language.

**I.**

The material facts are not disputed. *See* Joint Stipulations (FMSHRC Docket No. WEST 2004-182-RM filed Nov. 17, 2004) (Joint Appendix (JA) 7) (Stip.). The Access Road runs across Tejon's 27,000-acre ranch (Ranch), near the town of Lebec in southern California. National Cement operates a cement processing plant on leased property within the Ranch, extracting minerals such as limestone, shale and silica from quarries and processing them with other trucked-in materials to produce Portland cement for sale. National Cement is not the only commercial entity that conducts business on the Ranch and uses the Access Road. Tejon and several of its other lessees also use the Access Road in the course of their respective business, as set out below.

The cement processing plant property, which consists of about 5,000 acres, was initially leased, with easement rights over the Access Road, to Pacific Western Industries, Inc. (Pacific Western) in 1966 for three successive 20-year terms and a final 19-year term. Cement Manufacturing Plant Lease (Lease) at 3-4 (JA 41-42). The lease and easement rights were later assigned to National Cement. Under a "Road Easement Deed" filed October 13, 1965, National Cement has "a non-exclusive right-of-way and easement for the purpose of constructing,

reconstructing, altering, maintaining, repairing and using a road upon, over and across" a sixty foot-wide strip of land "for use and enjoyment by [National Cement] in connection with the construction and operation on [Tejon's] land of a plant or plants for the processing and manufacture of portland cement and related by-products pursuant to lease terms between [Tejon] and [National Cement]" for the duration of the lease. Road Easement Deed at 1 (JA 29). Under the deed, Tejon "reserves for itself, its successors and/or assigns, the right to use and cross over said road and the right to grant to others easements in proximity to, crossing or overlapping the right of way and easement [t]herein granted provided such other easements shall not materially interfere with the use and enjoyment of the right of way and easement [t]herein granted." *Id*. Road maintenance is governed by the 1966 lease which provides: "Lessee [National Cement] and the other grantees, if any, of joint-use easements and rights of way, pro rata in accordance with their respective use thereof, shall maintain all such easements and rights of way in such condition as necessary for use thereof by Lessee in the usual conduct of its business." Lease at 18 (JA 56).

Pacific Western developed the Access Road in the mid-1960s from an existing network of dirt roads on the Ranch. In the early 1970s, the California Department of Water Resources (DWR) constructed an aqueduct across the Ranch with a bridge running over it where it intersects the Access Road. DWR then realigned the Access Road to traverse the bridge. Today the Access Road is a paved 4.3-mile, two-lane road running north from State Route 138 to the cement plant. The Access Road's use is restricted to "Tejon's employees, vendors, contractors, lessees, licensees and visitors; National Cement's employees, vendors, contractors and visitors; and those persons so authorized by the State of California." Stip. ¶ 21 (JA 11). Signs indicating the restricted access are posted at the intersection with State Route 138 and along the initial segment of the road leading to the cement plant. Fencing, which encloses ranch land, runs

along either side of the road, with gates located at various points opening onto dirt roads, trails and livestock corrals. Tejon maintains locks on most of the gates. None of the gates is used by National Cement, which has its own gate and guardhouse at the north end of the Access Road in front of the cement plant.[1]

The Access Road provides the only vehicular access to the cement plant. While "[t]he majority of traffic on the road is for cement-plant-related purposes," *id*. ¶ 38 (JA 16),[2] the road is also used by (1) Tejon's ranch management staff, which travels it two to three times per month; (2) the Centennial Livestock Company, which leases 200,000 acres in the southern part of the Ranch where it maintains 7,000-9,000 head of cattle that are rotated among various fields every 6 months—its employees

_____

[1]Adjacent to the the guardhouse is a sign advising:

ANYONE ENTERING THIS FACILITY MUST STOP AT THE FRONT OFFICE AND CHECK IN BEFORE PROCEEDING TO ANY OTHER LOCATION WITHIN THE PLANT.
EXCEPT NATIONAL CEMENT EMPLOYEES, DELIVERY WORKERS and OVER THE ROAD TRUCK DRIVERS.
THIS INCLUDES, BUT IS NOT LIMITED TO VENDORS, SALESMEN, CONTRACTORS, SERVICEMEN, AND VISITORS.
   This is a Mine Safety and Health Administration, (MSHA) regulated site and as such requires all those who enter to comply with 30 Part 46 of the Code of Federal Regulations (CFR).

Stip. ¶ 27 (JA 14).

[2]That mining activity accounts for a "majority" of road use, as the parties stipulated, is not to say that it "dwarf[s]" road use, as the dissent asserts in its fifth "undisputed" fact, drawing on the ALJ's characterization. Dissent at 6 n.2.

make about 300 round trips on the road annually; (3) customers of Tejon's "Film Department" which contracts with entertainment production companies, commercial photographers and others to provide locations on the Ranch for filming; (4) patrons of Tejon's hunting program who use the road to access hunting areas (sometimes with Tejon guides) during 11 months of the year; (5) participants in Tejon's "Explorer Program" who pay an annual fee to explore and camp on the Ranch from February through August each year; (6) Tejon security personnel who make daily rounds; (7) consultants performing work on a planned 12,000-acre commercial and residential development, which Tejon hopes to begin constructing in 2009 and which will use the Access Road both during construction and after completion; (8) Federal Aviation Administration agents who use the road for access to a communication tower located on the Ranch; (9) utility agents who use the road for access to transmission lines and related facilities; and (10) DWR which uses the road to access its aqueduct and bridge. *Id*. ¶¶ 45-66, 33 (JA 17-24, 15).

Since the mine's inception, National Cement (and its predecessor cement plant operators) "have always maintained and kept in usable condition the road," without seeking permission of Tejon. *Id*. ¶¶ 35-37 (JA 16). In November 2003, for example, National Cement at its own expense resurfaced, sealed and restriped the road and installed speed bumps and speed limit signs. *Id*. ¶ 36 (JA 16). DWR, however, maintains "the bridge and its approaches" and National Cement "does not perform any construction or maintenance on this part of the road." *Id*. ¶ 31 (JA 15). DWR has installed "speed bumps and related warning signs on the road in both directions at the approaches to the bridge." *Id*. ¶ 34 (JA 15).

In 1992, a MSHA inspector cited National Cement for violating 30 C.F.R. § 56.9300(a), which requires: "Berms or guardrails shall be provided and maintained on the banks of

roadways where a drop-off exists of sufficient grade or depth to cause a vehicle to overturn or endanger persons in equipment."[3] *See* JA 155. On April 9, 1992, MSHA vacated the citation through the following notice:

> This action is to "vacate" this citation since it was issued in error.

> The main entrance roadway was from a public highway to the mine site office traveled by the company and public to reach the mine property.

> At the mine site near the main office where mine site activities begin was a posted guard shack indicating the restrictions and the actual activities of the mining operation.

> The main entrance from the main public highway was leased by the mine operator but used/traveled by various other personnel and the public—once arriving at mine property signs were posted that the mine office must be contacted prior to entering the work sites.

> The mine operator had no control over personnel using the entrance roadway until they arrived at the mine site office—(no security-locked gate at entrance off public highway).

*Id*. at 156.

---

[3]The Secretary's regulations define a "berm" as "a pile or mound of material along an elevated roadway capable of moderating or limiting the force of a vehicle in order to impede the vehicle's passage over the bank of the roadway." 30 C.F.R. § 56.2. The required berms or guardrails "shall be at least mid-axle height of the largest self-propelled mobile equipment which usually travels the roadway." *Id*. § 56.9300(b).

On February 4, 2003, a MSHA inspector issued a citation (No. 6351224) to National Cement because the Access Road contained "faded and missing delineators for the entire distance of the haulway" in violation of 30 C.F.R. § 56.9300(d)(3).[4] *Id.* at 157. During a routine review of the citation, MSHA's district office determined that the inspector incorrectly cited National Cement because 30 C.F.R. § 56.9300(d)(3) applies to "elevated roadways" that "are infrequently traveled and used only by service or maintenance vehicles." *See* ALJ Dec., 27 F.M.S.H.R.C. at 97. Accordingly, on February 13, 2003, Citation No. 6351224 was vacated and a new citation (No. 6351230) was issued for failing to install berms or guardrails in violation of 30 C.F.R. § 56.9300(a). The citation stated:

> The primary access road to the plant had no guard rails or berms to protect vehicles and persons from going over the edge of the road. There are drop off[s] all along the highway ranging up to approximately 25 feet where a vehicle could easily roll over. The road is used extensively by large over the highway trucks, miner's

---

[4]This regulation provides:

(d) Where elevated roadways are infrequently traveled and used only by service or maintenance vehicles, berms or guardrails are not required when all of the following are met:

. . .

(3) Delineators are installed along the perimeter of the elevated roadway so that, for both directions of travel, the reflective surfaces of at least three delineators along each elevated shoulder are always visible to the driver and spaced at intervals sufficient to indicate the edges and attitude of the roadway.

30 C.F.R. § 56.9300(d)(3).

vehicles, and various other vehicles. The two lane road without berms or guard rails presents a hazard, especially during inclement weather where the possibility of sliding and crashing may be prevalent.

JA 160.[5]

On April 14, 2003, after National Cement brought to MSHA's attention the vacatur of the 1992 citation, the MSHA inspector lowered the citation's negligence level from "Moderate" to "Low" because "[i]nformation . . . indicated that a previously issued citation for this condition was vacated, therefore the company's negligence was less than originally evaluated." *Id*. at 161. The MSHA District Manager concluded that MSHA had jurisdiction over the road but nonetheless on November 17, 2003 had the notice "vacated without prejudice due to inadequate notice that the road in question was subject to the Agency's jurisdiction." *Id*. at 162.

On December 16, 2003, the MSHA District Manager sent National Cement a letter informing it that MSHA considered the road subject to MSHA jurisdiction:

This letter is to inform you that MSHA has carefully reviewed the facts regarding the Wayne Hand Road which is located between National Cement Company's Lebec Plant, and Highway 138. The Mine Safety and Health Act Section 3(h)(1)(B) specifically includes "private ways and roads appurtenant to" mines, as "mines" subject to MSHA jurisdiction. MSHA, therefore, examines all pertinent facts to determine whether such roads are to be considered as part of a

---

[5]No one has suggested that the fencing along both sides of the road, which appears from photographs in the record to be strung wire, *see, e.g.*, JA 132, 135, 142, is an adequate substitute for the required berms or guardrails.

mine. Here, MSHA has determined that it has jurisdiction over the Wayne Hand Road leading from Highway 138 to the Lebec Plant. This jurisdiction is based on our finding that National Cement Company maintains this road, that it holds an easement on this road and that this road is the sole means of egress to and from the mine. It also appears that traffic to and from the Lebec Plant constitutes the vast majority of traffic along this road.

National Cement Company is hereby put on notice that conditions which violate applicable MSHA regulations with respect to the road shall be subject to MSHA's enforcement authority, effective immediately.

*Id*. at 163. Accordingly, on February 9, 2004, a MSHA inspector issued National Cement the subject citation (No. 6361036) for violating 30 C.F.R. § 56.9300(a). The citation reads:

The mine operator failed to provide berms and guardrails on the banks of the primary access road to the Lebec Cement Plant. There were drop offs along the roadway ranging from 6 ft. [t]o approximately 25 ft. and sufficient to cause a vehicle to overturn or endanger persons in equipment. The roadway was used extensively by large over-the-road trucks, delivery vehicles, and personal vehicles of mine personnel and vendors. The l[a]ck of berms or guardrails on the two lane road presented a hazard particularly during inclement weather when vehicles could be expected to slide and potentially become involved in accidents.

JA 164. National Cement filed a Notice of Contest of the citation and Tejon intervened in support of National Cement.

On cross-motions by MSHA and National Cement for summary decision on the issue of Mine Act jurisdiction, the ALJ

ruled in MSHA's favor in a decision dated January 12, 2005. *Nat'l Cement Co. v. Sec'y of Labor*, 27 F.M.S.H.R.C. 84 (2005). The ALJ concluded that the access road is a "mine" under the plain language of section 3(h)(1) of the Mine Act, 30 U.S.C. § 802(h)(1), and rejected National Cement's argument that "the circumstances of this case create ambiguity." *Id.* at 99. The ALJ then directed the parties to advise him within 30 days whether they had reached a settlement or wished to proceed to a hearing on the merits of the citation.

Upon motion filed by National Cement on November 17, 2005, the FMSHRC vacated the ALJ's decision, concluding that under the plain meaning of section 3(h)(1), the entire Access Road cannot be characterized as a "mine" under the Mine Act because to do so would violate the structure of the Act and produce "absurd results." *Sec'y of Labor v. Nat'l Cement*, 27 F.M.S.H.R.C. 721 (2005). The Commission "h[e]ld instead that only such portion of the access road over which National Cement and its customers have exclusive use can be considered an appurtenant road" and remanded the matter to the ALJ to establish the parameters of the specified portion. *Id.* at 735. The Secretary filed a petition for review of the Commission's decision on March 17, 2006.[6]

## II.

On review, "the Secretary's interpretation of the law must ' "be given weight by both the Commission and the courts." ' " *Sec'y of Labor v. Excel Mining, LLC*, 334 F.3d 1, 5-6 (D.C. Cir. 2003) (quoting *Sec'y of Labor v. Cannelton Indus., Inc.*, 867 F.2d 1432, 1435 (D.C. Cir. 1989) (quoting S. Rep. No. 95-181, at 49 (1977))). "When, as here, 'the Secretary and the

---

[6]In a letter filed December 12, 2006, the FMSHRC informed the court it "w[ould] not file a brief" and "w[ould] not participate as an active litigant."

Commission divide, it [is] . . . the Secretary rather than the Commission [who] is entitled to the deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *Id.* at 6 (quoting *Cannelton Indus.*, 867 F.2d at 1435 (alterations in original) (parallel citation omitted)). "Moreover, in the statutory scheme of the Mine Act, ' "the Secretary's litigating position before [the Commission] is as much an exercise of delegated lawmaking powers as is the Secretary's promulgation of a . . . health and safety standard," ' and is therefore deserving of deference." *Id.* (quoting *RAG Cumberland Res. LP v. FMSHRC*, 272 F.3d 590, 596 n.9 (D.C. Cir. 2001) (quoting *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 157 (1991))). In this case, however, we do not accord the Secretary's litigating position *Chevron* deference because she incorrectly treated the statute as unambiguous and interpreted it accordingly. *See Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006) (" '[D]eference to an agency's interpretation of a statute is not appropriate when the agency wrongly "believes that interpretation is compelled by Congress." ' " (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004) (quoting *Arizona v. Thompson*, 281 F.3d 248, 254 (D.C. Cir. 2002)))).

Under step one of *Chevron*, we "ask 'whether Congress has directly spoken to the precise question at issue,' in which case we 'must give effect to the unambiguously expressed intent of Congress.' " *Bluewater Network v. EPA*, 372 F.3d 404, 410 (D.C. Cir. 2004) (quoting *Chevron*, 467 U.S. at 842-43). "If the 'statute is silent or ambiguous with respect to the specific issue,' however, we move to the second step and defer to the agency's interpretation as long as it is 'based on a permissible construction of the statute.' " *Id.* (quoting *Chevron*, 467 U.S. at 843). Before the Commission, as here, the Secretary has relied on the plain meaning of the statute, viewing its language as unambiguous. *See* FMSHRC Dec., 27 F.M.S.H.R.C. at 726

("The Secretary argues for affirmance of the judge's decision because the definition of 'coal or other mine' *plainly* includes a road such as the one at issue." (emphasis added)); *see also id*. at 728 (rejecting "literal interpretation of the specific words used in section 3(h)(1)(B) offered by the Secretary"); Sec'y's Br. at 19-33 (asserting road is "mine" under section 3(h)(1)(B)'s "plain meaning").[7]   The statute has no plain meaning, however, because section 3(h)(1)(B)'s language is, in our view, ambiguous.

As explained earlier, section 3(h)(1)(B) establishes that a road is a "mine" subject to MSHA's jurisdiction if it meets two criteria: it must be (1) "private" and (2) "appurtenant to" an "area" that constitutes a "coal or other mine" under section 3(h)(1)(A).   30 U.S.C. § 802(h)(1)(B).   The FMSHRC, following the lead of the ALJ and with the approval of the parties, relied on the dictionary definition of "private" as "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." Webster's Third New Int'l Dictionary, 1804-05 (1993) (Webster's).   Under this definition, the term may be construed, as the Secretary argued and the Commission concluded, to mean restricted to the use of "a particular . . . group or class of persons"—in this case, all of the grantees to whom Tejon may grant a right of way—and their invitees—which, as it turns out, are many and varied, *see supra* p. [5].   Under the same definition, however, "private" may be construed more narrowly to mean restricted to the use of "a particular person" such as National Cement.   *See also* Webster's at 1805 (setting out alternative definition "belonging to or concerning an individual

---

[7]In her reply brief the Secretary argues for the first time that her interpretation is reasonable and is therefore due deference under *Chevron* step 2.  *See* Reply Br. at 23-25.

14

person, company, or interest"). Given these alternative meanings, the word "private" is, in our view, ambiguous.

The term "appurtenant to" is also ambiguous under the dictionary definition applied by both the ALJ and the Commission. "Appurtenant" is defined as " 'a: annexed or belonging legally to some more important thing (a right-of-way—to land or buildings); b: incident to and passing in possession with real estate—used of certain profits or easements.' " *See* FMSHRC Dec., 27 F.M.S.H.R.C. at 728 (quoting Webster's at 107). Under this definition, the phrase may be construed to encompass a road such as the Access Road because it is subject to a transferable right of way benefitting the mine lessee. Or, again, the term might have been used in a narrower sense, as suggested by the definitional language "annexed or belonging legally to," to mean dedicated exclusively to the use of the mine. *See* Webster's at 87 (defining "annex" as "to join in a closely united but subordinate capacity: take possession or control of **:** assume rights or jurisdiction over"); *id.* at 201 (defining "belong" as "to be the property of a person or thing").

In sum, both of the relevant statutory terms are ambiguous and the Secretary therefore erroneously interpreted them as bearing a plain meaning. In the event of such ambiguity, " 'it is incumbent upon the agency not to rest simply on its parsing of the statutory language'—'[i]t must bring its experience and expertise to bear in light of competing interests at stake.' " *Peter Pan*, 471 F.3d at 1354 (quoting *PDK Labs., Inc.*, 362 F.3d at 797-98 (citing *Chevron*, 467 U.S. at 865-66) (alteration in original)). If the agency has not done so, " 'at this stage it is not for the court "to choose between competing meanings." ' " *Id.* (quoting *PDK Labs., Inc.*, 362 F.3d at 798 (quoting *Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1072 (D.C. Cir. 1997))). "*Chevron* step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent

is not plain from the statute's face." *Id*. Because the Secretary did not recognize the ambiguities inherent in the statutory terms, we do not defer to her plain meaning interpretation but instead remand for her to treat the statutory language as ambiguous. *See id*. at 1352. We recognize that we do not ordinarily remand a case with instructions regarding the decisionmaking process of a litigant. As we have demonstrated above, however, it is well established that the Congress intended us to afford *Chevron* deference to the Secretary—a litigant below—not the Commission—the adjudicator below. Coupling that principle with the principle drawn from *Peter Pan* and *PDK Labs, Inc.*, requiring a *Chevron*-worthy agency to recognize ambiguity, we are left with no other rational result. Accordingly, we follow that course of action.

Both National Cement and Tejon identified "absurd results" they claimed would arise from the Secretary's plain meaning interpretation of the statute—because of National Cement's status as a non-exclusive right-of-way grantee, with only limited control or authority over the Access Road or its users outside the cement plant premises. These are not frivolous concerns.

First, it is questionable that National Cement, as a "nonexclusive" right-of-way grantee, has the authority to alter the road as the Secretary requires—notwithstanding National Cement has *sua sponte*, without interference, previously performed routine maintenance and made minor alterations (*e.g.*, installing speed bumps and speed limit signs). National Cement's easement is subject to the right Tejon reserved to itself to use the road—and to grant others the right to use it—along with National Cement. Alteration of the Access Road might interfere with the others' right to use it and Tejon's right as property owner to control it. In addition, it is undisputed that National Cement lacks authority to make any changes to the portion of the bridge approaching or crossing the aqueduct as DWR has the exclusive right to maintain this portion of the road

and has in the past installed speed bumps and signs. Stip. ¶ 34 (JA 25).

Second, under the Secretary's interpretation, National Cement as the mine "operator" would be required to assume responsibility for all road users, including those over whom it has no authority and with whom it has no business connection whatsoever. For example, as "operator" of the "mine," National Cement would be required to (1) comply with a withdrawal order of the Secretary requiring it to cause "all persons," including invitees of Tejon and other right-of-way grantees, to withdraw from a specified area of the Access Road, 30 U.S.C. § 814(b), (d)(1)-(2), (e);[8] (2) "[i]n the event of any accident occurring [on the road] . . . notify the Secretary thereof and . . . take appropriate measures to prevent the destruction of any evidence which would assist in investigating the cause or causes thereof," *id*. § 813(j); and (3) "provide site-specific hazard awareness training, as appropriate, to any person who is not a miner . . . but is present [on the road]," 30 C.F.R. § 46.11(b). National Cement could thus be liable for violating the cited provisions notwithstanding it lacks authority to comply with them because it lacks control over all Access Road users. *See* FMSHRC Dec., 27 F.M.S.H.R.C. at 732 ("[O]n appeal the Secretary has reaffirmed her authority to hold National Cement strictly liable for all violations, including those committed by unrelated third parties. Thus, as National Cement fears, it appears that the Secretary would issue a citation for Mine Act violations committed by a user of the road who had no connection to National Cement's operations.") (internal citation omitted).

---

[8]"[P]erson" is broadly defined in the Mine Act as "any individual, partnership, association, corporation, firm, subsidiary of a corporation, or other organization." 30 U.S.C. § 802(f).

Third, because the Act defines a mine "operator" expansively to include "any owner, lessee, or other person who operates, controls, or supervises a coal or other mine or any independent contractor performing services or construction at such mine," 30 U.S.C. § 802(d), under the Secretary's interpretation Mine Act jurisdiction would extend to Tejon as the "operator" (owner) of the Access Road and to any other party with right-of-way control over the Access Road notwithstanding the party lacks any relation whatsoever to the mine's operations. Each of them could be liable as a mine operator for mine safety infractions occurring on the Access Road.[9]

The Secretary responds that she will, "as a matter of prosecutorial discretion," refrain from citing "Tejon users whose conduct has no appreciable effect on the safety of National Cement miners." Sec'y's Br. at 39. This vague, open-ended (and unenforceable) representation offers scant comfort to the various road users who would be subject to liability under the Secretary's expansive construction of Mine Act jurisdiction. In any event, the Mine Act itself does not authorize such prosecutorial discretion but *mandates* that a citation issue when its provisions or the regulations promulgated thereunder are violated by a party within Mine Act jurisdiction. *See* 30 U.S.C. § 814(a) ("If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he *shall*, with reasonable promptness, issue a citation to the operator." (emphasis added)).

---

[9]In fact, the Secretary acknowledges that she would treat Tejon as an operator subject to Mine Act jurisdiction. *See* Sec'y's Br. at 37 n.9; Reply Br. at 15-16.

These are problems the Secretary must confront on remand if she continues to interpret section 3(h)(1) to extend Mine Act jurisdiction over the entire Access Road. Although a statutory interpretation that is "employed in the course of an adjudication constitutes an 'interpretative' statement and as such is exempt from the APA notice and comment requirements," nonetheless, under *Chevron* the Secretary must "offer a reasoned analysis" of her statutory reading. *Orengo Caraballo v. Reich*, 11 F.3d 186, 195, 193 (D.C. Cir. 1993). Reasoned analysis requires that the words of the statute " 'be read in their context and with a view to their place in the overall statutory scheme.' " *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 944-45 (D.C. Cir. 2004) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Here, this means that the Secretary must address the concerns raised by National Cement and Tejon and harmonize her interpretation of section 3(h)(1)(B) with the Mine Act's overall enforcement of mine safety standards. Given that National Cement lacks control over the Access Road or those traveling upon it beyond the well-marked boundaries of the cement processing plant itself such harmony may be difficult to achieve. As the Sixth Circuit has observed, the reach of Mine Act jurisdiction under section 3(h)(1)(B) is not limitless:

> Without some limitation on the meaning of "roads appurtenant to," MSHA jurisdiction could conceivably extend to unfathomable lengths since any road appurtenant to a mine that connects to the outside world would necessarily run into yet other roads, thus becoming one contiguous road. Because of the potential reach of MSHA jurisdiction if the definition in § 802(h)(1)(B) is left unfettered, "private ways and roads" cannot simply mean "any road." Otherwise, there could conceivably be no limit to MSHA jurisdiction, a result Congress clearly did not intend.

*Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 937 (6th Cir. 1997).

Because the terms "private" and "appurtenant to" in section 3(h)(1)(B), 30 U.S.C. § 802(h)(1)(B), are ambiguous and the Secretary instead interpreted them as having a plain, unambiguous meaning, we vacate the Commission's decision and remand for it to obtain from the Secretary a *Chevron* step 2 interpretation of section 3(h)(1)(B), which addresses the problematic issues raised by National Cement and Tejon.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting:  In issuing a citation to the National Cement Company of California for failing to install berms or guardrails along its access road, the Secretary of Labor relied on the jurisdiction of the Mine Safety and Health Administration under the plain text of the definition of a "mine" under section 3(h)(1)(B) of the Federal Mine Safety and Health Act of 1977 ("Mine Act"), 30 U.S.C. § 801 *et seq.*  Today, the court holds that the definition of "mine" is ambiguous and remands this case so that the Secretary may exercise discretion in interpreting her jurisdiction.  But there is only one legitimate interpretation of whether the access road is a "private" road "appurtenant to" land from which minerals are extracted, and thus is subject to Mine Act jurisdiction.  The Secretary adopted that plain text interpretation and the Federal Mine Safety and Health Review Commission (the "Commission") unanimously agreed that the literal interpretation of the text was unambiguous.  *See Sec'y of Labor v. Nat'l Cement Co. of Cal., Inc.*, 27 F.M.S.H.R.C. 721, 728 (2005); *id.* at 737-38 (Jordan, Comm'r, dissenting).  The court improperly relies upon policy considerations to find ambiguity where there is none.

## I.

Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), the court must give effect to the unambiguously expressed intent of Congress.  Under the plain meaning of the terms, the access road is "private" and it is "appurtenant to" land from which minerals are extracted.  The history and purpose of the Mine Act fully support the plain text reading and National Cement has offered no reason to avoid the literal meaning.

The Mine Act defines a "mine" to include "an area of land from which minerals are extracted," 30 U.S.C. § 802(h)(1)(A), and "private ways and roads appurtenant to such [an] area," *id.* § 802(h)(1)(B).  The parties agree that the cement plant at the

end of the access road is "an area of land from which minerals are extracted," meaning that it is subject to Mine Act jurisdiction if it is both "private" and "appurtenant to" the cement plant.

The access road is unambiguously a "private" road. It is located on private property and it is not open to the general public. There is, in fact, a sign posted by National Cement where the access road meets the public state highway that says, in large red lettering, "PRIVATE ROAD NO TRESPASSING." In a statutory provision, words are presumed to have their ordinary, common sense meanings. *See, e.g.*, *United States v. Johnson*, 529 U.S. 53, 57 (2000). As this court has previously recognized, "[i]t is beyond cavil that the common usage of 'private' refers to that which is not public or governmental." *Inner City Broad. Corp. v. Sanders*, 733 F.2d 154, 158 (D.C. Cir. 1984). In determining Mine Act jurisdiction, the Sixth Circuit has taken the natural step of looking to whether a road is "public" as opposed to "private." *See Bush & Burchett, Inc. v. Reich*, 117 F.3d 932, 936-38 (6th Cir. 1997). The court must engage in tortured reasoning to conclude that in specifying that Mine Act jurisdiction extends only to "private" roads, Congress plausibly may have meant to exclude more than just the natural antonym, "public" roads. As the Supreme Court has acknowledged, "[a]mbiguity is a creature not of definitional possibilities but of statutory context." *Brown v. Gardner*, 513 U.S. 115, 118 (1994); *see also Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n*, 372 F.3d 395, 400 (D.C. Cir. 2004). Nothing in the plain text of the Mine Act supports the court's dissection of the statute in search of ambiguity.

Similarly, by the plain text of the Mine Act, the access road is "appurtenant to" the cement plant. The court suggests that Congress might have been saying something about an operator's *exclusive* access to the road by requiring appurtenance. But the common meaning of appurtenance has nothing to do with

exclusivity. "An easement is appurtenant to land when the easement is created to benefit and does benefit the possessor of the land in his use of the land." RESTATEMENT (FIRST) OF PROPERTY § 453 (1944); *accord* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 1.5(1) (2000). It is unsurprising that the court's anointing of ambiguity in the word "appurtenant" is accompanied by no references to authorities in which appurtenance has been interpreted to require exclusivity. Counterexamples are plentiful.[1] Again, by the ordinary meaning of this term, the road is "appurtenant to" the cement plant because Tejon Ranchcorp has granted National Cement an easement providing a "right of way for the purpose of ingress and egress to and from" the cement plant.

The purpose of the Mine Act fully supports the literal interpretation of the statute supplied by a plain reading of its terms. Congress expressly declared that "the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource – the miner," 30 U.S.C. § 801(a), noting, among other things, that "the existence of unsafe and unhealthful conditions and practices in the Nation's coal or other mines is a serious impediment to the future growth of the coal or other mining industry and cannot be tolerated," *id.* § 801(d). As part of this initiative, Congress defined "mine" in a manner that this court has characterized as "sweeping," *Donovan v. Carolina Stalite Co.*, 734 F.2d 1547, 1554 (D.C. Cir. 1984), and that courts have acknowledged

---

[1] *See, e.g.*, *Bush & Burchett*, 117 F.3d at 937 (noting that public roads may be appurtenant to extraction facilities); *BR Assocs. v. LaFramboise*, No. 06-11870-BC, 2007 WL 1840031, at *1 (E.D. Mich. June 26, 2007) (referencing a "non-exclusive easement appurtenant"); *Bee Tree Missionary Baptist Church v. McNeil*, 570 S.E.2d 781, 783 (N.C. Ct. App. 2002) (similar); *State v. Japage P'ship*, 80 S.W.3d 618, 621 (Tex. App. 2002) (similar).

"makes clear that the concept that was to be conveyed by the word ['mine'] is much more encompassing than the usual meaning attributed to it," *Marshall v. Stoudt's Ferry Preparation Co.*, 602 F.2d 589, 591-92 (3d Cir. 1979); *accord Cyprus Indus. Minerals Co. v. Fed. Mine Safety & Health Review Comm'n*, 664 F.2d 1116, 1117-18 (9th Cir. 1981).

The legislative history of the Mine Act confirms Congress's intent. The Conference Committee expressed its intention to adopt a "broad[]" definition of what constitutes a "mine" that included "roads . . . related to the mining activity." S. REP. NO. 95-461, at 38 (1977) (Conf. Rep.), *reprinted in* SENATE SUBCOMM. ON LABOR, COMM. ON HUMAN RES., LEGISLATIVE HISTORY OF THE FEDERAL MINE SAFETY AND HEALTH ACT OF 1977, at 1316 (1978) (hereinafter LEGISLATIVE HISTORY). The Senate Committee on Human Resources added further emphasis, clarifying that "all private roads and areas" appurtenant to mineral extraction operations were covered. S. REP. NO. 95-181, at 14 (1977), *reprinted in* LEGISLATIVE HISTORY, *supra*, at 602.

## II.

To avoid the literal meaning of the Mine Act, National Cement, Tejon Ranchcorp, and the court suggest that "absurd results" would result therefrom. *See* Op. at 15-17. A party seeking to avoid the literal text because of the policy consequences faces "an exceptionally high burden." *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 146 (D.C. Cir. 2006), *cert. denied*, 127 S. Ct. 1121 (2007). To succeed, such a claim must be accompanied by a showing that "as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it." *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996). Here, the express purpose and history of the statute indicate that Congress meant precisely what it said.

The court concludes that National Cement and Tejon Ranchcorp have "valid" concerns that this interpretation will result in "absurd results," but this conclusion is flawed.

The "absurd results" doctrine is narrow in order to avoid having courts act as super-legislatures that balance the pros and cons of potential policies. Here, the court adopts the position of the Commission majority that Congress could not have intended a mine "operator" to be liable for what happens on a road for which it lacks complete control. Op. at 15-17. But as the dissenting Commissioner noted, "[p]ermitting concerns about future National Cement liability for non-mining related activity to guide the outcome of this case is letting the tail wag the dog." 27 F.M.S.H.R.C. at 741 (Jordan, Comm'r, dissenting).

The court's approach adds a requirement of exclusivity to the definition of a "mine" when its true concern is who constitutes an "operator," which is defined in section 3(d) of the Mine Act, 30 U.S.C. § 802(d). Not only has Congress set only two requirements for roads to be subject to the Mine Act, the necessary inference of which, in the absence of legislative intent suggesting otherwise, is that Congress intended no others, *cf. TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001), nothing suggests Congress acted absurdly by determining, in a separate section, who should be liable for Mine Act violations. If National Cement does not have sufficient control over the access road, then it might not be the "operator" of the access road, as the Secretary acknowledges. *See* Appellant's Br. at 36-37. But the conclusion to be drawn is not that the access road is beyond the jurisdiction of the Mine Act. The consequences of this reverse inference leave the possibility that a dangerous road covered by the plain text of the statute and referenced in the legislative history will not require berms or guardrails, despite steep drops (up to 25 feet), on a road traversed by heavy cement trucks more than 45,000 times a year.

The court's related concern that National Cement will be strictly liable for Mine Act violations involving non-mining activities on the access road is resolved similarly. If National Cement does not have the requisite control, then it might not be an operator that can be cited. The facts of this case[2] do not present an occasion to further speculate on how the Act would be interpreted, let alone enforced, should the issue arise. Before the court today is the definition of a "mine," and the Secretary was correct to conclude that the definition plainly includes National Cement's access road. A speculative concern about a tiny fraction of access-road users should not be used to uproot the major purpose of the Mine Act.

Finding no ambiguity in the definition of a "mine," I would remand the case to the Commission for adjudication of the citation on the merits. Accordingly, I respectfully dissent.

---

[2] It is undisputed in this court that: (1) the access road on the Tejon Ranch is privately owned; (2) National Cement operates the quarry to which the road provides the only vehicular access; (3) National Cement and Tejon Ranchcorp have entered into a long term lease that gives National Cement an easement, which transfers to successor lessees of the cement plant, to use the road to access the quarry from the state highway and allows National Cement to grant access to others; (4) the lease preserves the right of Tejon Ranchcorp to use the road and grant easements to others so long as those easements do not materially interfere with National Cement's operations; (5) National Cement's activities at the cement plant, which operates 7 days a week, dominate use of the access road in that the vast majority of traffic is related to the cement plant and other use of the road, the Administrative Law Judge found, "is dwarfed by National Cement traffic," *Nat'l Cement Co. of Cal., Inc. v. Sec'y of Labor, Mine Safety & Health Admin.*, 27 F.M.S.H.R.C. 84, 101 (2005); and (6) its heavy trucks traverse the access road hundreds of times a day and accidents have occurred on the road.