UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 14-1450**

---

POWER FUELS, LLC,

Petitioner,

v.

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION; SECRETARY OF
LABOR, MINE SAFETY AND HEALTH ADMINISTRATION,

Respondents.

---

On Petition for Review of an Order of the Federal Mine Safety
and Health Review Commission.  (VA 2013-403; VA 2013-312-R; VA
2013-313-R; VA 2013-353-R)

---

Argued:  December 11, 2014      Decided:  January 27, 2015

---

Before WILKINSON, GREGORY, and DUNCAN, Circuit Judges.

---

Petition for review denied by published opinion.  Judge
Wilkinson wrote the opinion, in which Judge Gregory and Judge
Duncan joined.

---

**ARGUED:** Wade Wallihan Massie, PENN, STUART & ESKRIDGE, Abingdon,
Virginia, for Petitioner.  Tamara Yael Hoflejzer Burnett, UNITED
STATES DEPARTMENT OF LABOR, Arlington, Virginia, for
Respondents.  **ON BRIEF:** Seth M. Land, PENN, STUART & ESKRIDGE,
Abingdon, Virginia, for Petitioner.  M. Patricia Smith,
Solicitor of Labor, Heidi W. Strassler, Associate Solicitor, W.
Christian Schumann, Appellate Litigation, Sara L. Johnson,

UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondents.

———————

WILKINSON, Circuit Judge:

Power Fuels, LLC, petitions for review of a final order of the Federal Mine Safety and Health Review Commission. Power Fuels operates a facility that receives, blends, stores, and delivers coal to meet the specifications of a power plant located across the road. The Department of Labor's Mine Safety and Health Administration ("MSHA") asserted jurisdiction over the facility under the Federal Mine Safety and Health Act of 1977 ("Mine Act").

The Mine Act covers operators of a "coal or other mine," including facilities engaged in the "work of preparing coal." 30 U.S.C. § 802(h)(1)(C), (i). Power Fuels challenged the Secretary of Labor's assignment of jurisdiction to MSHA, rather than to the nonspecialized Occupational Safety and Health Administration ("OSHA"). We hold that the Secretary permissibly concluded that a facility that blends coal for a nearby power plant was subject to the Mine Act. Because the Mine Act covers this kind of activity, MSHA's assertion of jurisdiction was proper. We therefore deny the petition for review.

I.

The parties do not dispute the facts underlying this case. In any event, we will sustain the Commission's factual findings

so long as they are "supported by substantial evidence on the record considered as a whole." 30 U.S.C. § 816(a)(1).

## A.

Power Fuels owns and operates a coal-blending terminal in Wise County, Virginia. At this site, Power Fuels receives, tests, weighs, samples, mixes, blends, stores, loads, and transports coal for its customer, Virginia Electric and Power Company, doing business as Dominion Virginia Power. Dominion runs a power plant, the Virginia City Hybrid Energy Center, which produces electricity from coal and biomass. Power Fuels' blending terminal and Dominion's plant are situated on adjoining properties.

Power Fuels works as a contractor for Dominion under a formal agreement. The products provided by Power Fuels include coal and coal refuse, or "gob." Power Fuels mixes an estimated average of eight thousand tons of coal per day for Dominion at the blending terminal, and the facility stores an eight-day supply of fuel for Dominion's use. Dominion owns all the coal that Power Fuels prepares. Approximately eighty percent of the fuel consumed at Dominion's plant passes through Power Fuels' blending terminal, while the remaining twenty percent comes to the plant from other locations.

Power Fuels blends the coal according to the precise specifications provided daily by Dominion to ensure a proper reaction at the power plant. After the coal arrives, Power Fuels samples it and moves the material into separate piles, and it then uses equipment at the facility to blend the coal as directed by Dominion. Dominion's orders specify, for example, the number of buckets of each material to be used in the desired blend, as well as moisture, ash, sulfur, and BTU content. Under the companies' agreement, Power Fuels may recommend modifications of Dominion's order, but it must blend the coal as instructed unless Dominion decides to change the specifications for that day. Power Fuels then tests the product. Based on the test results, Dominion may alter the order, in which case Power Fuels blends and tests the pile again until it meets Dominion's needs. The facility does not extract, crush, size, screen, or wash coal during this process. Finally, trucks transport the finished products across the road, from the blending terminal to Dominion's power plant.

B.

Dominion's plant and Power Fuels' terminal both began operations in 2011. The following year, an inspector from MSHA noticed trucks delivering coal to the Power Fuels site. The agency was unaware at the time of any coal-preparation

5

facilities operating there. An investigator from MSHA then visited the site and observed that Power Fuels was blending, storing, and loading coal for the power plant across the road. Following a review by MSHA and the Department of Labor's Office of the Solicitor, the Secretary determined that the blending terminal was subject to MSHA's jurisdiction.

Once MSHA asserted jurisdiction, the agency began performing inspections of the facility. In April 2013, an inspector issued three citations to Power Fuels for violations of MSHA standards involving the trucks' braking systems and warning devices. See 30 C.F.R. § 77.410(c), 77.1605(b). The agency assessed a civil penalty of one hundred dollars for each citation. MSHA later imposed additional citations on Power Fuels, but the contests of those citations have been stayed pending the outcome of this appeal.

Power Fuels contested the three initial citations on the ground that it was not the operator of a mine for the purposes of the Mine Act, and that MSHA consequently lacked jurisdiction. In November 2013, an administrative law judge for the Federal Mine Safety and Health Review Commission held an evidentiary hearing. In a March 2014 decision, the ALJ concluded that Power Fuels was engaged in the "work of preparing the coal" under the Mine Act. 30 U.S.C. § 802(h)(1)(C), (i). The ALJ took particular note of the fact that "the testing, blending, and re-blending as

6

necessary, are directly accomplished in order to [e]nsure and maintain the consistent quality of the coal pursuant to Dominion's quality specifications." J.A. 333. The ALJ accordingly ruled that MSHA's jurisdictional assertion was proper, and he affirmed the citations and accompanying penalties.

Power Fuels filed a petition for discretionary review with the Commission. The Commission declined to grant review, and consequently the ALJ's decision became the final order of the Commission. See 30 U.S.C. § 823(d)(1). Power Fuels now petitions for review in this court. See id. § 816(a).

## II.

### A.

The Mine Act specifically protects the safety and health of individuals who work in a "coal or other mine." 30 U.S.C. § 802(h)(1)(C); see id. § 801. But even before MSHA asserted jurisdiction under the Mine Act, Power Fuels' blending terminal was not beyond the reach of federal safety and health regulations. The Occupational Safety and Health Act of 1970 ("OSH Act") provides a statutory baseline for "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). This far-reaching enactment mandates workplaces "free from recognized

7

hazards." Id. § 654(a)(1). Where Congress has enacted an industry-specific statute conferring authority over working conditions on another agency, however, the OSH Act does not apply. 29 U.S.C. § 653(b)(1). The Mine Act, which governs occupational safety and health at "[e]ach coal or other mine," is such a statute. 30 U.S.C. § 803.

In practice, then, the regulatory dynamic involves displacement: MSHA may "exercise[] its statutory authority under the Mine Act in such a way as to preempt OSHA's regulatory jurisdiction under the OSH Act." United Energy Servs., Inc. v. Fed. Mine Safety & Health Admin., 35 F.3d 971, 977 (4th Cir. 1994). The OSH Act is "comprehensive," Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 147 (1991), but it also affords space for specialized regulatory schemes. The Secretary of Labor administers both the Mine Act and the OSH Act and determines initially whether a workplace falls under the jurisdiction of MSHA, rather than OSHA. See, e.g., Sec'y of Labor v. Nat'l Cement Co. of Cal., 494 F.3d 1066, 1073 (D.C. Cir. 2007).

The regulatory systems administered by MSHA and OSHA share many similarities, but the differences -- in scope and enforcement -- may hold significant implications for an employer and its employees. For example, although OSHA has established extensive workplace standards for toxic and hazardous

substances, see 29 C.F.R. pt. 1910, subpts. H, Z, MSHA's regulations are specifically tailored to the dangers that arise from handling coal, such as exposure to coal dust and other airborne contaminants, see 30 C.F.R. pt. 71. The Mine Act also provides the Secretary with an array of enforcement mechanisms, such as inspections, investigations, recordkeeping, citations, and orders, that are particularized to the industry's hazards. See 30 U.S.C. §§ 813, 814. The Secretary may need to draw on "historical familiarity and policymaking expertise" to determine which agency's framework is appropriate for a given workplace. Martin, 499 U.S. at 153.

B.

With the Mine Act, Congress fashioned a law that is not only tailored to a specific industry, but also comprehensive in its coverage. The force of the statute is evident even from Congress's preliminary declarations. 30 U.S.C. § 801(c) (identifying "an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal or other mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines"). Congress also expressed particular solicitude for the individuals who are continually exposed to the hazards of mining. Id. § 801(a) (announcing that

9

"the first priority and concern of all in the coal or other mining industry must be the health and safety of its most precious resource -- the miner"). And Congress indicated that, even as new mandatory standards were developed, id. § 801(g)(1)-(2), operators would need to work with their employees to keep these workplaces safe, id. § 801(e) (stating that "the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines").

The Mine Act is also a broadly written statute. "Each coal or other mine" is subject to the coverage of the Mine Act, id. § 803, and that term carries an expansive statutory meaning, see id. § 802(h)(1). As relevant to this case, the Mine Act provides that the term "coal or other mine" encompasses:

> lands, excavations, underground passageways, shafts, slopes, tunnels and workings, structures, facilities, equipment, machines, tools, or other property including impoundments, retention dams, and tailings ponds, on the surface or underground, used in, or to be used in, or resulting from, the work of extracting such minerals from their natural deposits in nonliquid form, or if in liquid form, with workers underground, or used in, or to be used in, the milling of such minerals, or the <u>work of preparing coal</u> or other minerals, and includes custom coal preparation facilities.

Id. § 802(h)(1)(C) (emphasis added). The definition of the "work of preparing the coal," in turn, includes a lengthy list of activities, as well as a flexible final phrase: "the breaking,

10

crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine." Id. § 802(i).

As the statutory text makes clear, the coverage of the Mine Act is not limited to extractive activities only. The Act, crucially, extends to a variety of activities involved in preparing coal. The statute's jurisdictional reach is deliberately broad, and the concomitant definitions are not rigid. As the Senate Committee Report stated, "what is considered to be a mine and to be regulated under this Act" ought to "be given the broadest possibl[e] interpretation," and any "doubts" about jurisdiction ought to "be resolved in favor of inclusion of a facility within the coverage of the Act." S. Rep. No. 95-181, at 14 (1977), reprinted in 1977 U.S.C.C.A.N. 3401, 3414. In sum, Congress concluded that the workplace hazards associated with mining coal or other minerals required safety and health measures specifically tailored to the industry. Congress thus produced a comprehensive statute to ensure that the people who face such dangers -- even workers involved not in extraction but in preparation -- would be protected.

11

III.

Power Fuels contends that MSHA's jurisdiction under the Mine Act does not reach the company's blending terminal. According to Power Fuels, the facility simply blends and stores coal as directed by a utility, and it does not undertake the type of work usually performed by the operator of a coal mine. But the Mine Act plainly says that a covered coal mine may engage in the "work of preparing coal," 30 U.S.C. § 802(h)(1)(C) -- such as "mixing," "storing," and "loading" coal, as well as other comparable activities, id. § 802(i). The Act even states that coal mines may include "custom coal preparation facilities." Id. § 802(h)(1)(C). Whether this question is viewed through the prism of the kind of facility that Power Fuels operates or the kind of work that Power Fuels performs, it is clear that Power Fuels falls within the coverage of the Mine Act.


A.

Power Fuels' blending terminal is the type of facility that is subject to the Mine Act. The Mine Act enables MSHA to regulate "[e]ach coal or other mine," "each operator of such mine," and "every miner in such mine." 30 U.S.C. § 803; see id. § 802(d), (g), (h). The statutory meaning of "coal or other mine" expressly embraces facilities engaged in the "work of

12

preparing coal." Id. § 802(h)(1)(C). The coal mines covered by the Act also specifically include "custom coal preparation facilities." Id. Power Fuels' blending terminal is such a facility.

At the blending terminal, Power Fuels receives, tests, weighs, samples, mixes, blends, stores, loads, and transports coal to meet the specifications of its customer, Dominion. With some eight thousand tons of coal mixed each day and eight days of fuel stored onsite, this is not a small operation. Coal preparation logically involves an anticipated use -- preparation for something else. See also Bureau of Mines, U.S. Dep't of the Interior, A Dictionary of Mining, Mineral, and Related Terms 226 (Paul W. Thrush ed., 1968) (defining "coal preparation" as a "collective term for physical and mechanical processes applied to coal to make it suitable for a particular use"). The anticipated use here is consumption at Dominion's power plant across the road. As Power Fuels itself explains, Dominion's plant "employs state-of-the-art systems," and the composition of each coal blend produced by Power Fuels "has to meet precise specifications to react properly in the furnace burn chamber." Petitioner's Br. at 3, 5. Even though Dominion sets the specifications, it is the Power Fuels facility that prepares the coal for the finely calibrated, continually customized

13

consumption process at Dominion's plant. In letter and spirit, the Mine Act extends to facilities of this kind.

B.

It is further evident that the type of work performed by Power Fuels comes within the purview of the Mine Act. The Act's definition of "coal or other mine" refers to the "work of preparing coal." 30 U.S.C. § 802(h)(1)(C). Under the statute, the "work of preparing the coal" may involve an array of enumerated actions -- "breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading" coal. Id. § 802(i). The string of statutory verbs is indicative of Congress's intent to regulate a comprehensive range of activities related to coal preparation. More pointedly, several of those verbs describe precisely what Power Fuels is doing. Power Fuels avers that it does not crush, size, screen, or wash coal. But, as Power Fuels acknowledges, it does engage in several of the covered functions: the terminal mixes, stores, and loads coal.

Beyond the enumerated activities, the "work of preparing the coal" also encompasses "such other work of preparing such coal as is usually done by the operator of the coal mine." Id. Power Fuels argues that this phrase serves to limit the listed

14

verbs to work "of the type" usually performed by mine operators. We do not read the phrase so restrictively.

We think this phrase is one of inclusion, not exclusion. It broadens the range of activities covered rather than limiting them. Indeed, the statute tells us that the "work of preparing the coal" includes the enumerated verbs "and" also this "other work." Id. (emphasis added). Under the grammatical "rule of the last antecedent," the qualifying words (here, "as is usually done by the operator of the coal mine") ordinarily modify only the term that they immediately follow (here, "such other work of preparing such coal"). See, e.g., Barnhart v. Thomas, 540 U.S. 20, 26-28 (2003); see also 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 47:33 (7th ed. 2014). Moreover, the phrase "as is usually done by the operator of the coal mine," 30 U.S.C. § 802(i) (emphasis added), refers to the particular coal mine in question, not a paradigmatic coal-mine operator, as Power Fuels suggests.

Our interpretation accords not only with the grammatically sound meaning of this provision, but also with the mode of analysis mandated by precedent. This court has explained that the Mine Act "sets forth a functional analysis, not one turning on the identity of the consumer." United Energy Servs., Inc. v. Fed. Mine Safety & Health Admin., 35 F.3d 971, 975 (4th Cir. 1994). We have emphasized that "the proper focus of our analysis

15

is on the safety of mining operations," and indeed it is highly significant if a company's "employees are subject to the same risks as any other employee engaged in the 'work of preparing coal.'" Id. The inquiry turns on how the facility uses the coal and whether the employees are exposed to the safety and health hazards associated with coal-preparation activities. The text of the statute, which defines "coal or other mine" and the "work of preparing the coal," provides basic tools for this functional test. 30 U.S.C. § 802(h)(1)(C), (i). Power Fuels' blending terminal performs the "work of preparing coal" -- indeed, massive quantities of coal each day -- and thereby subjects workers to the risks contemplated in the Mine Act.

Power Fuels contends that this interpretation admits no limitation. That is incorrect. The limitations are expressed in the statute itself. The Mine Act covers those sites used for the "work of preparing coal," including "custom coal preparation facilities," like that operated by Power Fuels. Id. § 802(h)(1)(C). Covered sites may be engaged, inter alia, in the "mixing," "storing," and "loading" of coal as well as "such other work of preparing such coal as is usually done" by this entity. Id. § 802(i). Such activities are the reason the Power Fuels facility is in business. In fact, the statute seems written with coal-preparation sites like Power Fuels' in mind. But the Mine Act does not encompass all companies that burn or

16

consume coal, and we do not suggest that it does. The jurisdictional inquiry is more particularized. MSHA's own enforcement guidance indicates that the agency "will not inspect facilities where coal is prepared solely to facilitate loading and not to meet specifications or to render the coal for any particular use." Mine Safety & Health Admin., U.S. Dep't of Labor, 1 Program Policy Manual § 3-4, at 2 (rev. ed. June 12, 2014). In other words, MSHA's jurisdiction does not extend to every facility where coal may in some way be involved. The scope of the Act may still exceed what Power Fuels might wish, but that of course is a matter of policy entrusted to Congress, not the courts.

By contrast, Power Fuels' suggested approach may herald a return to the era before the Mine Act was enacted in 1977. One predecessor statute, the Federal Coal Mine Safety Act, ch. 877, 66 Stat. 692 (1952), covered a much narrower range of coal operations. Under this 1952 statute, a "mine" was used only for the "work of extracting . . . coal" and the "work of processing the coal so extracted" by the mine operator. § 201(a)(7), 66 Stat. at 692 (emphasis added). The "work of processing the coal" was restricted to that "usually done by the operator," and it specifically excluded processing activities "usually done by a consumer or others." Id. Seventeen years later, Congress broadened the statutory coverage in the Federal Coal Mine Health

17

and Safety Act of 1969, Pub. L. No. 91-173, 83 Stat. 742. The 1969 legislation defined a "coal mine" as involved in the "work of extracting . . . coal" and the "work of preparing the coal so extracted," and the term's meaning expressly included "custom coal preparation facilities." § 3(h), 83 Stat. at 744. The revised law spoke of "preparing" rather than "processing" coal, and it eliminated the language from the 1952 statute that had excluded coal processing usually done by a consumer or other actors. § 3(h), (i), 83 Stat. at 744. Finally, in 1977, Congress passed the Mine Act, integrating safety and health protections for miners of coal and other minerals into one statute -- covering such workers whether they are engaged in extraction, milling, or preparation. 30 U.S.C. § 802(h)(1)(C). The present Mine Act provision, notably, no longer references coal "so extracted": it simply uses the now-familiar term, the "work of preparing coal." Id.; see id. § 802(i).

The 1977 Mine Act has driven the functional analysis employed by this court. We decline the invitation to interpret the Mine Act in a way that returns extraction, or other outmoded distinctions, to the center of the analysis. Such an approach might have been appropriate under the legislative framework that prevailed a half century ago. It is not today.

The parties disagree over the degree of deference we owe to the Secretary of Labor's interpretation. The basic question is whether we should defer to the Secretary's interpretation so long as it is reasonable, Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984), or whether his interpretation is entitled to respect only to the extent of its "power to persuade," Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). But we need not explore that issue. Congress's intent in the Mine Act is plain, and "[i]f the intent of Congress is clear, that is the end of the matter." Chevron, 467 U.S. at 842; see also id. at 843 n.9. In any event, the Secretary's interpretation here warrants respect. See Sec'y of Labor ex rel. Wamsley v. Mut. Mining, Inc., 80 F.3d 110, 114-15 & n.3 (4th Cir. 1996). The Secretary, after all, is the administrator charged with overseeing the borderline between the background regulations of OSHA and the specialized regulations of MSHA. We have been instructed not to "waste [our] time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is 'jurisdictional' or 'nonjurisdictional.'" City of Arlington v. FCC, 133 S. Ct. 1863, 1870 (2013). Instead we are asked to decide, "simply, whether the statutory text forecloses the agency's assertion of authority, or not." Id. at 1871. In this instance, it does not.

IV.

For the foregoing reasons, the petition for review is denied.

<u>PETITION FOR REVIEW DENIED</u>