**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1085

STATE OF SOUTH CAROLINA; SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL; SAVANNAH RIVER MARITIME COMMISSION; AUGUSTA, GEORGIA,

Plaintiffs − Appellees,

and

SAVANNAH RIVERKEEPER, INC.,

Intervenor/Plaintiff,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; UNITED STATES ARMY CORPS OF ENGINEERS SAVANNAH DISTRICT; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army; LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commanding General and Chief of Engineers, U.S. Army Corps of Engineers; MAJOR GENERAL DIANA M. HOLLAND, in her official capacity as Commanding General, South Atlantic Division, U.S. Army Corps of Engineers; COLONEL DANIEL H. HIBNER, in his official capacity as District Engineer, U.S. Army Corps of Engineers, Savannah District,

Defendants – Appellants,

and

GEORGIA PORTS AUTHORITY,

Intervenor/Defendant.

------------------------------

CHAMBER OF COMMERCE OF GREATER AUGUSTA, GEORGIA, INCORPORATED; PCS NITROGEN FERTILIZER, L.P.,

Amici Supporting Appellee.

---

Appeal from the United States District Court for the District of South Carolina, at Aiken. Richard M. Gergel, District Judge.  (1:19−cv−03132−RMG)

---

Argued:  January 27, 2023                                      Decided:  April 19, 2023

---

Before NIEMEYER, KING, and DIAZ, Circuit Judges.

---

Vacated and remanded by published opinion.  Judge Diaz wrote the opinion, in which Judge King joined.  Judge Niemeyer wrote a dissenting opinion.

---

**ARGUED:**  Michael Thomas Gray, UNITED STATES DEPARTMENT OF JUSTICE, Jacksonville, Florida, for Appellants.  Chad Nicholas Johnston, BURR & FORMAN LLP, Columbia, South Carolina; David Montgomery Moore, EARTH & WATER LAW, LLC, Atlanta, Georgia, for Appellees.  **ON BRIEF:**  Todd Kim, Assistant Attorney General, Robert P. Stockman, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Jacksonville, Florida; Erica Zilioli, Phillip Paradise, UNITED STATES CORPS OF ENGINEERS, Washington, D.C., for Appellants. Randolph R. Lowell, BURR & FORMAN LLP, Charleston, South Carolina, for Appellees. Susan Bodine, EARTH & WATER LAW, Atlanta, Georgia, for Intervenor/Appellee. Brian C. Lea, Atlanta, Georgia, Megan Lacy Owen, JONES DAY, Washington, D.C., for Amici Curiae.

---

2

DIAZ, Circuit Judge:

The New Savannah Bluff Lock and Dam sits on the Savannah River near Augusta, Georgia. For over 80 years, the Dam has raised the height of the Savannah River around it, creating a "pool" of water at the Augusta riverfront. The Augusta community uses the pool for water supply and recreation. Locals dock their boats in the pool and fish from the Dam, and crowds converge at the riverfront for an annual triathlon and regatta.

While popular with humans, the Dam has been less well received by the endangered Atlantic and shortnose sturgeon that populate the Savannah River. Because the sturgeon can't pass through or over the dam, they aren't able to migrate upstream to their historic spawning grounds.

In passing the Water Infrastructure Improvements for the Nation Act ("WIIN Act"), Congress directed the U.S. Army Corps of Engineers to design a fish-passage structure for the New Savannah Bluff Lock and Dam "that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment." The Corps settled on a design that would lower the pool of water by about three feet.

On appeal, we're asked to interpret that provision of the WIIN Act. The district court held that the Corps' plan didn't "maintain the pool" since it would lower it from its height on the date of the Act's enactment. But the Corps argues that this reading ignores the clause "for water supply and recreational activities," and that a lowered pool that still fulfills these functions would comply with the Act.

Finding the Corps' reading more persuasive, we vacate the judgment of the district court and remand for further proceedings.

3

I.

A.

In 1999, Congress authorized the Savannah Harbor Expansion Project, a billion-dollar undertaking to deepen and widen the Savannah River navigation channel. An environmental impact study found that the project would adversely impact the ability of Atlantic and shortnose sturgeon to reach their spawning grounds. To mitigate these effects and bring the Project into compliance with the Endangered Species Act,[1] the federal agencies decided to build a fish passage around the Dam that would allow the sturgeon to migrate farther upstream.

But Congress upended the agencies' plans for the fish-passage structure when it passed the WIIN Act—a broad-ranging bill authorizing water projects across the country—in 2016. *See* WIIN Act, Pub. L. No. 114-322, § 1319(b)(1)(A), 130 Stat. 1628, 1703 (2016). The Act gave the Corps only two options for the planned fish-passage structure: The Corps could repair the Dam and modify it to allow fish to pass over it. *Id.* § 1319(c)(1)(A)(i). Or it could construct a fish-passage structure across the Savannah River and demolish the Dam. *Id.* § 1319(c)(1)(A)(ii).

The Corps chose the latter option after conducting the required environmental analyses and evaluating various designs and locations. The Corps' design envisioned removal of the Dam and construction of a 500-foot-wide in-channel rock weir—"a water

---

[1] See 16 U.S.C. § 1536, which requires agencies to determine whether their actions may adversely impact an endangered or threatened species (and if so, to consult the National Marine Fisheries Service about mitigation measures). *See also* App. 270, 289.

4

damming and control structure that allows water to flow over its top"—in its place. Appellants' Br. at 13. The Corps projected that this structure would lower the pool about three feet in normal conditions while allowing fish to pass over it and migrate upstream.

The Corps also modeled the effects of its design on the riverfront community, concluding it wouldn't adversely impact the water supply, fishing, large events, or the "continued general use of boat docks." App. 185. But a simulation the Corps ran in 2019 proved disastrous. During the simulation, the Corps drew the water level in the pool down several feet, exposing mudflats for miles along the Savannah River. The drawdown test ran docks aground and threatened Augusta's water intake. The Corps ultimately had to halt the test.[2]

Undaunted, the Corps pressed ahead with its proposed design.

B.

The State of South Carolina and several of its agencies responded by suing the Corps and various federal officials. Their complaint sought declaratory and injunctive relief, alleging that the Corps' design violated the WIIN Act, the National Environmental Policy Act, the Administrative Procedure Act, state law, a previous settlement agreement, and

---

[2] The Corps blames the low water levels on unusual circumstances that day, to include a nearby dam undergoing maintenance and high recent rainfall that made the drop "appear more dramatic by comparison." App. 748.

certain easements. The City of Augusta intervened as a plaintiff and the Georgia Ports

Authority intervened as a defendant.[3]

The Corps moved to dismiss almost all the claims, including the WIIN Act claim,

for lack of jurisdiction and failure to state a claim. Plaintiffs moved for partial summary

judgment and for a preliminary injunction.

As relevant here, Plaintiffs charged that the WIIN Act "requires that any repair or

replacement structure of the [Dam] must maintain the pool at the same elevation as it was

on December 16, 2016," when the Act was enacted—specifically, 114.76 feet NGVD29[4]

at the gage immediately upstream of the Dam.[5] App. 59. Plaintiffs claimed that the Corps'

design would "dramatically lower the water elevation from the conditions that existed" on

that date. App. 60. And pointing to the failed drawdown test, Plaintiffs argued that the

"simulation did not maintain the pool for navigation, water supply, and recreational

activities, as in existence on December 16, 2016." *Id*.

---

[3] We refer to Appellees South Carolina, the state agencies, and Augusta as "Plaintiffs," and Appellants the Corps and related federal individual defendants as "the Corps."

[4] This unit, "National Geodetic Vertical Datum of 1929," measures elevation above mean sea level.

[5] The U.S. Geological Survey operates a network of more than 11,000 gages that monitor the water levels of rivers and streams across the country. *See* Water Resources Mission Area, *USGS Streamgaging Network*, U.S. Geological Surv. (Apr. 27, 2021), www.usgs.gov/mission-areas/water-resources/science/usgs-streamgaging-network (last visited March 28, 2023). The district court relied on a daily average measurement taken at Gage 02196999, which sits just above the Dam.

The Corps responded that the WIIN Act didn't require them to "maintain the pool" at a specific level, but to preserve its use "for water supply and recreational activities" as it existed on the day of enactment. Its chosen design satisfied this functionality requirement, the Corps argued, because it wouldn't affect the water supply and would provide water sufficient for recreational activities.

The district court consolidated a hearing on the Corps' motion to dismiss and Plaintiffs' motion for a preliminary injunction with a trial on the merits of Plaintiffs' WIIN Act claim under Federal Rule of Civil Procedure 65(a)(2). Following the hearing, the court entered judgment for Plaintiffs on their WIIN Act claim.

The WIIN Act, the court reasoned, "unambiguously requires the agency to construct 'a structure that is able to maintain the pool for water supply and recreational activities' at a very precise level—that level existing on the date of the adoption of the Act." App. 2592. And there was "no dispute" that the Corps design couldn't maintain that level. *Id*.

The court found that the agency's interpretation read the word "sufficient" into the statute: i.e., "a structure that is able to maintain the pool sufficient for water supply and recreational activities." *Id*. But this concept of "functionality" was nowhere in the statute. So the district court held that the Corps' chosen design had exceeded its statutory authority.

The court also entered a permanent injunction barring the Corps "from implementing [its design] and any other plan involving the removal of the Savannah Bluff Lock and Dam if the proposal does not 'maintain the pool' that was in existence on the date of the Act's enactment, which was 114.76 feet NGVD29." App. 2596.

This appeal followed.

7

## II.

The issue before us is this: Did the district court err in concluding that, as a matter of law, the Corps' chosen design for the Savannah River project wasn't "able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment" of the WIIN Act?

We review questions of statutory interpretation and challenges to an agency's statutory authority de novo. *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242–43 (4th Cir. 2009); *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, 983 F.3d 671, 679–80 (4th Cir. 2020). And we conclude that—by focusing solely on the water level in the pool—the district court erred.

## A.

At the outset, the parties dispute how to frame the district court's order. According to the Corps, the district court "concluded that any project that the Corps builds must keep the pool at precisely 114.76 feet NGVD29" to avoid violating the WIIN Act. Appellants' Br. at 23. But Plaintiffs say this is a strawman. They say that the court didn't require the Corps "to maintain a static pool, frozen at a precise water level"—rather, its references to 114.76 feet NGVD29 were just a "benchmark" against which to evaluate the Corps' chosen alternative. Appellees' Br. at 26–27.

The Corps' view finds some support in the district court's order. The court found as a fact that the Corps' chosen design "does not maintain the pool that existed on December 16, 2016, 114.76 feet NGVD29." App. 2591. And the injunction the court entered bars the Corps from adopting any proposal that doesn't "'maintain the pool' that

8

was in existence on the date of the Act's enactment, which was 114.76 feet NGVD29." App. 2596.  Even still, we decline to read this language literally, for such an order would be absurd.  (As our dissenting colleague notes, even Plaintiffs don't advance this reading. *See* Dissent at 29.)

Ultimately, however, the dispute is auxiliary.  The Corps hangs its hat on the argument that "any interpretation of the WIIN Act that focuses on water elevations inevitably leads to absurd results and cannot be correct, whether the elevation is a static requirement or a malleable 'benchmark.'"  Reply Br. at 9.  And the Corps admits that "under normal conditions," its design "would reduce the elevation of the pool by about three feet immediately upstream of the Dam."  Appellants' Br. at 1.  So our inquiry is:  Did the district court err in finding that the Corps' design violated the WIIN Act because it doesn't "meet the 114.76 standard . . . by at least 3 feet"?  App. 2588 n.2.  In other words, should the court have looked instead at whether the pool would be maintained "for water supply and recreational activities," its precise elevation notwithstanding?

### B.

To answer that question, the parties offer competing readings of the statutory text: "a structure that is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act."  WIIN Act § 1319(c)(1)(A)(ii).  The Corps contends that the clause beginning "as in existence" applies to "water supply and recreational activities," so the Corps "must maintain the pool for those purposes as they existed when Congress passed the WIIN Act."  Appellants' Br. at 32.  Plaintiffs respond that the statute "clearly requires that the pool *itself* be 'maintain[ed]' as in existence on the

9

date of the enactment," and that the Corps' interpretation imports a "functionality" requirement not found in the statute. Appellees' Br. at 31 (emphasis added). We think the Corps has the better reading.

Before explaining why, we address a preliminary issue. The parties disagree whether the Corps' interpretation is entitled to *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that courts will give weight to an agency's interpretation "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"). Because we find that Congress's intent in the WIIN Act was plain, however, we "need not explore that issue"; "If the intent of Congress is clear, that is the end of the matter." *Power Fuels, LLC v. Fed. Mine Safety & Health Rev. Comm'n*, 777 F.3d 214, 221 (4th Cir. 2015) (cleaned up).

1.

With *Skidmore* behind us, we turn to the text. To interpret a statute, "we look first to its language, giving the words used their ordinary meaning." *Dwoskin v. Bank of Am., N.A.*, 888 F.3d 117, 119 (4th Cir. 2018) (cleaned up). "We are [loath] to contradict the established principle that statutes must be interpreted to give each word some operative effect." *Crespo v. Holder*, 631 F.3d 130, 135 (4th Cir. 2011) (cleaned up).

The district court found that the statute's plain meaning was unambiguous: It required the Corps to construct "a structure that is able to maintain the pool for water supply and recreational activities" at "that level existing on the date of the adoption of the Act." App. 2592. But the Corps offers several reasons why we should doubt that reading.

10

First, the Corps invokes the canon against surplusage, which prescribes that "[a] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned up). As the Corps argues, the clause "for water supply and recreational activities" is doing no work in the district court's reading: The statute could simply read "maintain the pool at that level existing on the date of the adoption of the Act" and have the same meaning.

The Corps also points out that Congress phrased the other project option slightly differently. If the Corps chose to repair and modify the existing Dam, the modified structure would have "to maintain the pool for *navigation*, water supply, and recreational activities, as in existence on the date of enactment of this Act." WIIN Act § 1319(c)(1)(A)(i)(I) (emphasis added). The district court's reading would ignore this distinction—again, only the resulting height of the pool would matter.

Plaintiffs respond (and our friend in dissent agrees) that "for navigation, water supply, and recreational activities" is a prepositional phrase whose only function is to "add[] project purposes." Appellees' Br. at 33–34. In other words, the phrases in the statute are merely "descriptive." *Id*. at 40. But that verges on making them "insignificant"—the statute would have "precisely the same content" if they were struck. *See Duncan*, 533 U.S. at 174. In the Corps' reading, the prepositional phrases do real work.

The Corps would also have us apply the "rule of the last antecedent," under which "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). The

11

Corps argues the limiting clause "as in existence on the date of enactment of this Act" immediately follows "water supply and recreational activities"—indicating that Congress meant for the Corps to preserve the existing water supply and recreational functions. Appellants' Br. at 32–33. Or in the alternative, the Corps argues, the limiting clause modifies the entire phrase "the pool for water supply and recreational activities."

We find that the Corps' alternative reading best aligns with Supreme Court precedent. The rule of the last antecedent typically applies when a modifier is asked to qualify "a remote or otherwise disconnected phrase," so it would take "more than a little mental energy" to stretch the modifier back. *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018) (cleaned up). But when a modifier "directly follows a concise and 'integrated' clause," the Supreme Court has more often declined to apply the rule. *Id.* For example, in the phrase "The woman dressed to the nines carrying an umbrella, as shown in the picture," few would assume that only the umbrella is pictured. *Id.*

Here, we likewise find that the "as in existence" clause modifies the entire integrated phrase "the pool for water supply and recreational activities." This reading gives effect to every word in the statute.

The district court found the Corps' interpretation flawed because it added the word "sufficient"—i.e., the Corps must build a structure "able to maintain the pool [sufficient] for water supply and recreational activities." App. 2592. But "sufficient" is suggested by the word "for," which Merriam-Webster defines as "a function word to indicate purpose"

12

or an "intended goal."[6] The purpose of "maintain[ing] the pool" was "for" the water supply and recreational activities. Implicit in the word "for" is that the maintenance of the pool will be "sufficient" to meet these purposes.

We conclude that the "as in existence" clause modifies "the pool for water supply and recreational activities." And to give effect to the "for" clause, the benchmark for whether the Corps has "maintain[ed]" the pool is whether the pool supports the water-supply and recreational uses in existence when Congress enacted the Act.

2.

There's still more to commend the Corps' reading of the Act. Because statutory language "cannot be construed in a vacuum[,] [i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (cleaned up). Reasoning from context, the Corps makes a persuasive case that the district court's water level-based interpretation is unlikely and unworkable.

First, the Corps argues, Congress opted not to specify a water level in the text, despite mentioning specific water levels in at least two other provisions of the WIIN Act. *See* WIIN Act § 1307(a) (flowage easements at another project are "extinguished above elevation 82.2 feet (NGVD29), the ordinary high water line"); *id.* § 3608(b)(11) (defining "conservation storage capacity" at another project with a range of surface elevations). And

---

[6] *For*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/for (last visited March 28, 2023).

in other statutes, Congress has ordered the Corps to maintain specific water levels. *See, e.g.*, Water Resources Development Act of 1988, Pub. L. 100-676, § 21(a) (directing the Secretary of the Army to "maintain water levels in the Mississippi River headwaters reservoirs within [specific] operating limits[.]"). We think it reasonable to infer that, had Congress intended to require a specific water level for the pool, it would have "used language similar to what it used" in other parts of the WIIN Act and other statutes. *Boumediene v. Bush*, 553 U.S. 723, 777 (2008).

Plaintiffs respond that each Corps project requires its own Congressional authorization, so there's "no overall statutory scheme" for us to examine. Appellees' Br. at 28. But as the Corps argues, it's at least "relevant that in authorizing thousands of projects nationwide in Water Resources Development Acts and similar Acts passed every couple of years for more than a century, Congress has never done anything like what the Plaintiffs argue it did here." Reply Br. at 8.

We also agree with the Corps that pinning the required pool height to the "arbitrary and unknowable-to-Congress date that the President signed the legislation" leads to "absurd results." Reply Br. at 9. Had the elevation of the pool been exceptionally low or high on December 16, 2016, the district court's interpretation would have held the Corps to that level regardless. In response, Plaintiffs suggest that the statute only obligates the Corps to maintain the pool at its "normal operating range." Appellees' Br. at 27. But neither the statute nor the district court's order makes clear this permissible "range."

Finally, the Corps argues that requiring it to maintain the water level at 114.76 NGVD29 at the gage above the existing Dam undermines its ability to construct the fish-

14

passage structure "at an appropriate location" of its choosing. WIIN Act § 1319(c)(1)(A)(ii). Had the Corps opted to build the structure a few miles upstream (instead of at the site of the existing dam), it argues, the resulting "pool" would inevitably have a different size and other characteristics—so "the pool" as it then existed wouldn't be "maintain[ed]." Reply Br. at 10–11. Plaintiffs respond that the Corps could "pick a different location, as long as the project is able to maintain the pool as it existed on the date of enactment." Appellees' Br. at 41.

But any location other than the current Dam site will change some physical aspect of the pool, "with the size of the pool being most obvious." Reply Br. at 11. Looking to the pool's ability to support its water-supply and recreation functions—instead of narrowly focusing on its physical characteristics—best avoids making "at an appropriate location" surplusage.

III.

Our friend in dissent would affirm the district court, finding that the Corps' proposed weir "would not be able to maintain the pool at the level as it existed" when the WIIN Act was enacted. Dissent at 30. In his view, the Corps' "rationalization that the weir would nonetheless serve the statutory purposes of the pool" doesn't absolve its "noncompliance." *Id.*

First, the dissent suggests that our interpretation "ignores entirely the historical and statutory context of the WIIN Act." *Id.* at 20. Of course, we don't "resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–

15

48 (1994). But even if the WIIN Act isn't pellucid, general "historical context" about the Savannah River Dam doesn't settle the debate. It's true that the Corps has at times "describe[d] the pool in terms of its elevation in feet NGVD29." Dissent at 23. But the Corps doesn't contend that the water level is irrelevant—only that the WIIN Act doesn't pin them to a specific water level (or range of levels).

Moreover, the post-drawdown concerns of area legislators three years after the Act's passage don't shed much light on Congressional intent. *Id.*; *see Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 n.11 (1979) ("[I]solated statements by individual Members of Congress . . . , all made after the enactment of the statute under consideration, cannot substitute for a clear expression of legislative intent at the time of enactment."). And even if we did weigh these comments, they arguably support the Corps' interpretation: The legislators were alarmed about the pool "becoming useless for recreational activities," after all. Dissent at 23.

Our colleague claims that measuring the pool by its elevation is "a rational approach, if not the necessary one," because a pool's *depth* can change with the "aggregation of silt or the removal of silt from dredging." Dissent at 24. But insistence upon a specific water level at the expense of other considerations could lead to unintended results. If the Corps largely filled in the pool with silt but left a foot of water on top, for example, the elevation of the pool might technically be "maintained." But surely Plaintiffs wouldn't be satisfied with that result.

Next, our dissenting colleague suggests that our interpretation of the WIIN Act "sidesteps the natural reading of the statutory text based on grammar and word usage." *Id.*

16

at 20.  In his view, the comma in the text stands for a suppressed "and," so the statute really reads "for water supply and recreational activities *and* as in existence . . . ."  *See id.* at 26–27.

But we don't typically read so much into a comma.  Nor is it clear how our colleague divines what word the comma supplants—that is, why the comma (as used here) is a stand-in for "and," not "but" or "or."  According to the Government Publishing Office manual our colleague cites, "omission of a word" is just one of sixteen potential uses of a comma.  *See* U.S. Government Publishing Office, *Style Manual*, 130 (2000) (offering the example "Then we had much; now, nothing.").  Our reading, in which a comma sets off a modifying clause, follows familiar drafting conventions and requires far less guesswork.  *See, e.g.*, *Bloate v. United States*, 559 U.S. 196, 206 n.10 (2010); *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021).

IV.

In all, we are persuaded by the Corps' interpretation of the WIIN Act.  We therefore vacate the district court's judgment for Plaintiffs on their WIIN Act claim, as well as the resulting permanent injunction against the Corps.  We leave it to the district court to decide whether the Corps' chosen design can maintain the pool's then-extant water-supply and recreational purposes.

*VACATED AND REMANDED*

17

NIEMEYER, Circuit Judge, dissenting:

In connection with its authorization to deepen the harbor at the Port of Savannah, Georgia, Congress directed the U.S. Army Corps of Engineers to either repair or replace, at the Corps' election, the New Savannah Bluff Lock and Dam ("the Savannah River Dam"), which is upriver from the Port, in a manner that would allow shortnose and Atlantic sturgeon swimming upriver from the Port to bypass the dam. The Army Corps elected to replace the dam with a rock weir that would function as a dam but have no lock and that would allow the sturgeon to pass over it.

This case presents the question of whether the Army Corps' proposed weir satisfies Congress's authorization, as contained in the Water Infrastructure Improvements for the Nation ("WIIN") Act, Pub. L. No. 114-322, § 1319, 130 Stat. 1628, 1703 (2016). Particularly with respect to the construction of a replacement structure, Congress required that it "[*be*] *able to maintain the pool* for water supply and recreational activities, *as in existence* on the date of enactment of this Act." *Id.* § 1319(c)(1)(A)(ii)(I) (emphasis added). The inclusion of this language was the product of years of engagement between the State of South Carolina, the City of Augusta, Georgia, and the Georgia Ports Authority (hereinafter "the States") and the Army Corps, effectively amounting to a resolution of their differences, especially over the potential disturbance of the existing water supply and recreational activities.

The record shows that the Army Corps' proposed weir will undisputedly be unable to maintain the pool behind the weir at the levels that existed when the WIIN Act was enacted. But the Corps argues that, under its posited interpretation of the Act, the water

18

level of the pool is irrelevant to the requirement to maintain a pool as in existence at the Act's enactment because the proposed structure would still allow "for water supply and recreational activities" as they existed at the time of the Act's enactment. As the Corps contends:

> It makes no difference textually if "the pool" is a slightly lower water elevation after Alternative 2-6d [the weir]; it remains "the pool" because it is still "a body of water forming above a dam" serving the same functions. A pool remains a pool when it continues to serve the same functions. . . .

The States contend that the correct reading of the applicable provisions of the WIIN Act requires that the Army Corps maintain the pool *as it existed* on December 16, 2016, when the Act was enacted, and that such a pool was historically defined and understood by both the Army Corps and the States to be one maintained within the range of 114.5 to 115 feet NGVD29 and that, in fact, the pool level on the Act's enactment date was within that range at 114.76 feet NGVD29. ("NGVD29" refers to the "National Geodetic Vertical Datum of 1929," which uses the "mean sea level" datum of 1929 as a constant reference point.) The States note that it is undisputed by the parties that the pool that would be created by the proposed weir could not achieve those levels but would be approximately 3.5 feet lower. They contend that, for a pool that is 15 feet at its deepest, such a drop in water level would have a materially adverse effect on water supply and recreational activities upriver from the weir.

The district court, in ruling on the States' motion for an injunction, found as fact that the Army Corps' proposed weir would not be able to maintain the pool as it existed on December 16, 2016, when the WIIN Act was enacted. Accordingly, the court entered a

19

permanent injunction prohibiting the Army Corps from "implementing Alternative 2-6d [the weir] . . . if the proposal does not 'maintain the pool' that was in existence [on] the date of the Act's enactment, which was 114.76 feet NGVD29."

The majority opinion, however, reverses the district court and agrees with the Corps' interpretation of the Act — that the Act does not require the maintenance of a specific pool, but rather authorizes *any* pool that *functions* to support the water supply and recreational activities as they existed at the time of the WIIN Act's enactment. It also concludes that "had Congress intended to require a specific water level for the pool," it would have done so, as it had in other parts of the WIIN Act and in other statutes. *Supra* at 14. Thus, the majority concludes, even though the weir would be unable to achieve the level of the pool that existed on the Act's date of enactment, the weir nonetheless could comply with the Act's requirements if it would still "support" the water supply and recreational activities.

I submit that the majority's interpretation ignores entirely the historical and statutory context of the WIIN Act, which makes clear what "maintain[ing] the pool" means. Moreover, the majority's interpretation also sidesteps the natural reading of the statutory text based on grammar and word usage.

20

I

The historical, judicial, and legislative context of the WIIN Act is important to a proper understanding of its meaning and purpose. *See Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012). This is because the WIIN Act was the culmination of a long process of litigation, negotiations, and legislation among the States, the Army Corps, the relevant communities, and Congress.

In 1932, South Carolina created the Savannah River Navigation Commission and empowered it to secure the land and easement rights for the United States' construction of the Savannah River Dam. And as stated in the language of the easements that the Commission obtained, the rights received to erect and operate the Savannah River Dam defined the dam "with crest control gates so operated as to maintain a pool elevation at said dam of 114.5 feet mean sea level." (In 1973, the "mean sea level" data set was redenominated NGVD29.) After the Commission obtained those easements, it conveyed them to the United States by means of recorded deeds, each of which included the pool elevation requirements. Accordingly, when the Army Corps took title to the lands for the construction of the Savannah River Dam, it did so subject to the express condition that the pool be at 114.5 feet NGVD29.

Then, in 1937, the Army Corps constructed the Savannah River Dam, which contained both a lock to enable navigation and gates to maintain the pool at the level specified. Over the years, the Army Corps maintained the pool by adjusting the gates throughout each day to keep the pool within its normal operating range, targeted to be between 114.5 and 115 feet NGVD29. While there were periods of water shortage when

the pool level fell to 113.2 feet or lower, those periods occurred less than 5 percent of the time during a sample period of four years from March 2015 to March 2019. And it is undisputed that the pool level was targeted at 114.5 to 115 feet NGVD29 and that the pool level on the date of the WIIN Act's enactment was within that range, at 114.76 feet NGVD29.

The WIIN Act was the product of a long period of negotiations and legal proceedings. Initially, in 2000, the Army Corps proposed removing the Savannah River Dam altogether, which provoked litigation initiated by the States. But in the final Environmental Impact Statement for that proposal, the Corps stated that removing the dam was "infeasible" and "unacceptable due to the development that now occurs upstream along the pool created by the dam." Thereafter, the Corps and the States entered into a settlement agreement that provided that the dam would remain in place, and that agreement was incorporated into the court's order dismissing the case and ending the litigation.

Thereafter, Congress enacted the Water Resources Reform and Development Act of 2014, which implemented the settlement, retaining the dam and authorizing a fish passage around the dam. But two years later, it enacted the WIIN Act, providing the Army Corps with authority to either repair or replace the dam, so long as the existing pool was maintained, which had been the States' concern from the beginning.

Moreover, during the Army Corps' development of a plan to implement the WIIN Act by either repairing or replacing the Savannah River Dam, the pool was one of the main concerns, and it was always defined in terms of the water level, expressed in feet NGVD29, i.e., the level above mean sea level. Virtually all of the Corps' documents relating to the

22

Savannah River Dam, the Corps' maintenance of it, and the Corps' adoption of the weir proposal describe the pool in terms of its elevation in feet NGVD29. For example, in its notice of the decision to implement Alternative 2-6d, the weir proposal, the Army Corps described the structure as "a 500 foot width weir with an average crest elevation of . . . 109.0 feet NGVD29." And in the Army Corps' Supplemental Environmental Assessment, which the Corps recommended that the district court view as the "primary document in the administrative record that should guide the Court's review and analysis of these claims," the Army Corps acknowledged that "currently, under normal project operations, the pool upstream of [the Savannah River Dam] is maintained by Corps personnel between elevations 112.5 and 114.5 ft NGVD29 by adjusting the gate settings as specified in the 1996 Savannah River Basin Water Control Manual. Typically, under low and average flow conditions, the target pool elevation is between 114 and 114.5 ft NGVD29 . . . ." The document explained that the pool was "managed by adjusting the gates at the dam . . . throughout the day to keep the pool within its normal operating range." And when a test that was conducted to simulate the pool that would be created by the proposed weir failed, the U.S. Senators from South Carolina and Georgia wrote the Corps complaining about the proposed pool, *referring to its level*. The letter noted, "On February 15, 2019, the Corps halted the drawdown simulation after effects of the river drawdown resulted in instability of the Georgia riverbank in the residential neighborhood of Goodale Landing. In addition, the simulation resulted in numerous docks becoming useless for recreational activities while they sat in the mud *given the reduced pool level*. Clearly, these results do not reflect the intent of Congress." (Emphasis added). The letter went on to note that "the Corps must

23

maintain the river conditions that were in place on the date of enactment" and that "the recent drawdown test has proven [that] Alternative 2-6d [the weir] does not appear to meet the requirement of the plain text of the legislation or the intent of Congress when it passed the WIIN Act."

Thus, over the years, the pool behind the Savannah River Dam has consistently been at the center of discussion, and all involved parties have always described the pool by its NGVD29 level.

This is certainly a rational approach, if not the necessary one, when describing a pool. The level of a pool determines the area that it covers and thus its impact on its surroundings. Moreover, a measurement by reference to the NGVD29 level is based on a constant. The other most obvious way to describe a pool would be to describe it by its depth, as would be relevant for navigation. But the depth of a pool would not be as practical a measure for defining it, as that measurement might not remain constant. The bottom of a pool could change because of the aggregation of silt or the removal of silt from dredging. Thus, it is not surprising that the pool behind the Savannah River Dam has, over the years, consistently been defined by the elevation of its surface. And, more importantly, it has never been *defined* by its purpose or its impact on its surroundings.

Not only is this context of the pool's definition important to understanding whether a proposed replacement structure would "maintain" the pool within the meaning of the WIIN Act, but it also serves to show how the pool effects the Act's purposes, whether they be navigation, power, water supply, or recreation. Lowering the pool level by only a few feet can materially alter the pool's usefulness for those purposes. This was indeed

24

demonstrated in this case when the Army Corps conducted a test in February 2019 to simulate the effects of reducing the pool level to that which its proposed weir would create. The States claim that the test showed that reducing the pool level by only a few feet would be incompatible with the continued functioning of existing facilities for water supply and opportunities for recreational activities. As they describe the test:

> On or about February 9, 2019, the Corps began a simulated drawdown test in order to demonstrate the effects of Weir Alt 2-6d on pool level. The drawdown test was an unmitigated failure, and the Corps was forced to halt the drawdown simulation on February 15, 2019. The field test left hundreds of feet of shoreline for the 17-mile long pool dry, recreational facilities such as docks, rowing facilities, marina, boat houses were on mudflats and without water, and the drawdown threatened Augusta's N. Max Hicks water intake. Pool levels during the field test were so low that subsidence of property and damage to structures was observed.

The States support that description with numerous photographs taken by the Army Corps of the conditions created. The amici describe the situation similarly, noting that the simulation "so reduced the pool level as to expose mudflats and to cause a retaining wall to buckle in the absence of water holding it in place."

These observations confirm that evaluating whether the Army Corps' proposed plan complies with the WIIN Act's directive that the Army Corps maintain *the* pool *as it existed* on the date of the Act's enactment necessitates reference to the pool's NGVD29 level.

In this context, the district court found *as fact* that, with the construction of the proposed weir, the pool behind the Savannah River Dam would not be maintained as it existed on December 16, 2016. That finding should end the debate. But unfortunately it hasn't because the majority has ignored the relevant context.

25

II

Without reference to the WIIN Act's context, the majority opinion concludes that the WIIN Act requires only *a pool sufficient to serve as a water supply and for recreational activities*, regardless of the pool's level.  It reaches this conclusion by two methods.  *First*, it construes the text of the Act contrary to some basic principles of grammar and usage.  *Second*, it characterizes the States' position inaccurately, enabling it to conclude that their position would lead to absurdity.  Neither method, however, is sound or fair.

The operative language of the Act permits a replacement structure so long as it "is able to maintain the pool for water supply and recreational activities, as in existence on the date of enactment of this Act."  WIIN Act § 1319(c)(1)(A)(ii)(I).  Thus, the proposed weir must maintain "*the* pool," which in turn is modified by two elements of the sentence: (1) the prepositional phrase "for water supply and recreational activities," and (2) the clause "as in existence on the date of enactment of this Act."  The phrase "for water supply and recreational activities" describes the purpose of the pool, which is indicated by the preposition "for."  And the "as in existence" clause refers back to the pool that must be maintained.  The fact that a comma precedes the "as in existence" clause indicates that the clause relates to an earlier element in the sentence, rather than to its immediate antecedent, which is the prepositional phrase.  Grammatically, the comma here indicates omission, *see* U.S. Government Printing Office, *Style Manual*, 130 (2000) (noting the use of commas "[t]o indicate the omission of a word or words"), and thus supplants the suppressed conjunctive "and," which, if included, would obviate the need for the comma and also relate back to "the pool."  To be sure, if the comma were omitted without including the

26

suppressed "and," then the "as in existence" clause would modify the nearest antecedent, the prepositional phrase "for water supply and recreational activities." This is the approach taken by the majority. But the grammatical function of the comma in the text here is instead very similar to that recognized by the Supreme Court in *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 138 S. Ct. 1061, 1077 (2018), where the Court noted that the phrase, "The woman dressed to the nines carrying an umbrella, as shown in the picture," means that "the picture" would be referring to "the woman" and not "an umbrella." *See also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 161 (2012).

To avoid this grammatically grounded construction of the WIIN Act, the majority finds it necessary to add words to support its own construction. Under its construction, the Act means that the Corps must maintain the pool *that supports* water supply and recreational activities that were *in existence* on the date of the enactment. *Supra* at 12–13. This reading changes the obvious meaning of the statutory text by failing to recognize that the definite article in "*the* pool" anticipates a clause introduced by a restrictive term such as "that" or "as" — thus, "the pool that" or "the pool *as* in existence" on December 16, 2016. To convert the text to one that supports its desired outcome, the majority adds "that supports" before "water supply and recreational activities" in order to change that clause from one that is *descriptive* to one that is *restrictive*. The word "for" in the text indicates description — "the pool *for* water supply and recreational activities" — whereas the phrase "that supports" converts description to a restriction of the meaning of "the pool." That is a material change. Without such editing, the statutory text defines "the pool" as the one

27

"in existence" at enactment. Thus, both my reading and the majority's treat the meaning of "pool" to be restricted. But whereas my reading adheres to the text of the statute as written, such that "the pool" that must be maintained is the pool *as* in existence at the Act's enactment (*i.e.*, having a certain water level), the majority refuses to take the text as is, and instead adds words to derive an entirely different meaning — that the Corps is obliged merely to maintain a pool *that* supports use as a water supply and recreational area. This is an unnatural twisting of the meaning of the statute, effected only by adding words to the language that Congress chose to express its intent.

The majority also argues that if the "as in existence" clause modifies "the pool," then the prepositional phrase "for water supply and recreational activities" would provide no service and would be mere surplusage. This conclusion, however, overlooks the natural *descriptive* function of the prepositional phrase that distinguishes the function of "the pool" in this subsection from the function of "the pool" in the previous subsection. If the Army Corps had elected to "repair" the Savannah River Dam, as authorized by § 1319(c)(1)(A)(i), it would have had to maintain the pool "*for navigation*, water supply, and recreational activities" (emphasis added), which would indicate that "the pool" should be maintained not only at the level as in existence when the Act was enacted but perhaps also at a depth that would be consistent with "navigation." But in electing to replace the Savannah River Dam, the Army Corps was not required to consider navigational uses, but only water supply and recreational activities.

The prepositional phrase in each alternative thus describes the *purpose* of the pool, but not its existential properties. The language describing its existential properties requires

28

that the *structure* be *able* to maintain *the pool* as it existed on the date of the Act's enactment.

In addition to sidestepping applicable rules of grammar and word usage, the majority also attacks the States' interpretation by attributing to both the district court and the States an argument that it finds absurd — that the WIIN Act requires that the Army Corps maintain the pool at "*precisely*" 114.76 feet NGVD29, the level that existed on the date of the WIIN Act's enactment. But this attribution is unfair. First, the district court prohibited construction of the weir because it did "not 'maintain the pool' that was in existence on the date of the Act's enactment, which was 114.76 feet NGVD29." The level identified in the order was descriptive of the level at the time of enactment and fell within the targeted range at which the Army Corps *was maintaining* the pool. Indeed, the Corps was quite precise in seeking to adjust the pool's level throughout each day, targeting 114.5 to 115 feet NGVD29. Consistent with this, the court's directive was to maintain the pool *as it was in existence* earlier, not at a level defined to the hundredth of a foot.

Moreover, it is clear that the States do not advocate reading the WIIN Act in the way that the majority attributes to them — that the Act mandates the maintenance of a *precise, unachievable level* of 114.76 feet NGVD29. Indeed, the States call this a "strategically-set up strawman" argument attributed to it by the Corps. They note that the word "precisely" is not in the statute. Rather, they argue that the pool had to be *maintained* as the Corps had maintained it over the years, including on the date of the WIIN Act's enactment. And it was undisputed that the Corps maintained the pool by targeting 114.5 to 115 feet NGVD29 and that the level at the date of enactment fell within that range.

29

Finally, the States note that the statutory text requires a "structure" "that is *able* to maintain" the pool as it existed on the WIIN Act's enactment date. In short, they point out that the structure must have *the capacity* to achieve the 114.76 foot NGVD29 level, as the statute requires, not that the pool be maintained at the precise level. By itself, this observation by the States fully responds to the majority's absurdity argument.

*      *      *

In sum, the weir proposed by the Army Corps would not be able to maintain the pool at the level as it existed under the Army Corps' own maintenance of the Savannah River Dam on the date that the WIIN Act was enacted, and the Corps concedes this. Therefore, the weir would not comply with the Act's clear requirement. The Corps' defense is a rationalization that the weir would nonetheless serve the statutory purposes of the pool. This argument, however, does not absolve the Corps' noncompliance.

Also, I would note that at oral argument, the Army Corps did not dispute that it could modify the plans of the proposed weir so that the pool would remain at the preexisting level, and I believe that it should do so. Much anxiety and future litigation could thereby be avoided.

I would affirm the judgment of the district court.

30